606 F.2d 1094
 196 U.S.App.D.C. 187
 TENNESSEE GAS PIPELINE COMPANY, a Division of Tenneco Inc., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Public Service Commission of the State of New York, Entex,
Inc., Columbia Gas Transmission Company, Public Service
Electric and Gas Company, Northern Illinois Gas Company and
New England Customer Group (Bay State Gas Co.), Intervenors.
PUBLIC SERVICE COMMISSION OF the STATE OF NEW YORK, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Tennessee Gas Pipeline Company, Columbia Gas Transmission
Corporation, New England Customer Group, et al.,
Northern Illinois Gas Co. and Public
Service Electric and Gas Co.,
Intervenors.
INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Columbia Gas Transmission Corp., Tennessee Gas Pipeline Co.,
Public Service Electric and Gas Co. and Public
Service Commission of the State of New
York, Intervenors.
TRANSCONTINENTAL GAS PIPE LINE CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Columbia Gas Transmission Corp., United Cities Gas Company,
Public Service Electric & Gas Company, Tennessee
Gas Pipeline Co. and Public Service
Commission of the State of New
York, Intervenors.
MICHIGAN WISCONSIN PIPE LINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Wisconsin Natural Gas Co., Associated Natural Gas Co. and
Michigan Gas Utilities Co., Intervenors.
 Nos. 77-1496, 77-1498, 77-1653, 77-1712 and 77-1719.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 29, 1978.
Decided June 20, 1979.
Rehearing Denied Oct. 16, 1979.
 
 Harold L. Talisman, Washington, D. C., with whom Melvin Richter, Dale A. Wright, Patricia A. Curran, Terence J. Collins, Gregory Grady and Lilyan G. Sibert were on the brief, for Tennessee Gas Pipeline Co., petitioner in No. 77-1496, intervenor in Nos. 77-1498, 77-1653 and 77-1712 and amicus curiae in No. 77-1719.
 Richard J. Flynn, Washington, D. C., with whom Frederic G. Berner, Jr., and Charles V. Shannon, Washington, D. C., were on the brief, for Michigan Wisconsin Pipe Line Co., petitioner in No. 77-1719 and amicus curiae in No. 77-1496.
 Thomas F. Ryan, Jr., Washington, D. C., with whom Robert G. Hardy, Washington, D. C., was on the brief, for Transcontinental Gas Pipe Line Corp., petitioner in No. 77-1712.
 Edward W. Hengerer and Norman A. Pedersen, Attys., Federal Energy Regulatory Commission, Washington, D. C., with whom Howard E. Shapiro, Sol., and Philip R. Telleen, Atty., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondents.
 
 
 1
 Richard A. Solomon, Washington, D. C., with whom Peter H. Schiff, Albany, N. Y., and Sheila S. Hollis, Washington, D. C., were on the brief, for Public Service Commission of the State of New York, petitioner in No. 77-1498 and intervenor in Nos. 77-1496 and 77-1712.
 
 
 2
 Jerome J. McGrath, John H. Cheatham, III, Washington, D. C., and J. Evans Attwell, Houston, Tex., were on the brief, for petitioner Interstate Natural Gas Ass'n of America in No. 77-1653.
 
 
 3
 John D. Daly and Giles D. H. Snyder and Stephen J. Small, Charleston, W. Va., were on the brief for intervenor Columbia Gas Transmission Corp. in Nos. 77-1496, 77-1498, 77-1653 and 77-1712.
 
 
 4
 Robert H. Gorske, Milwaukee, Wis., was on the brief, for intervenor Wisconsin Natural Gas Co. in No. 77-1719.
 
 
 5
 Irving Jacob Golub, Stephen A. Wakefield, William B. Cassin and Phillip D. Endom, Houston, Tex., were on the brief, for amicus curiae United Gas Pipe Line Co. in Nos. 77-1496, 77-1498 and 77-1653.
 
 
 6
 Allan Abbot Tuttle, Robert W. Perdue and Dennis Lane, Attys. Federal Energy Regulatory Commission, Washington, D. C., entered appearances for respondent.
 
 
 7
 Paul W. Fox and John W. Glendening, Jr., Washington, D. C., for intervenor New England Customer Group in Nos. 77-1496 and 77-1498.
 
 
 8
 J. Stanley Stroud, Chicago, Ill., entered an appearance for intervenor Northern Illinois Gas Co. in Nos. 77-1496 and 77-1498.
 
 
 9
 Carl W. Ulrich, William R. Duff, Washington, D. C., Edward S. Kirby and James R. Lacey, Newark, N. J., entered appearances for intervenor Public Service Electric and Gas Co. in Nos. 77-1496, 77-1498, 77-1653 and 77-1712.
 
 
 10
 Michael J. Manning and Patrick J. Keeley, Washington, D. C., entered appearances for intervenor Entex, Inc. in No. 77-1496.
 
 
 11
 Jack M. Irion, Shelbyville, Tenn., entered an appearance for intervenor United Cities Gas Co. in No. 77-1712.
 
 
 12
 Richard M. Merriman, J. Richard Tiano and Richard T. Witt, Washington, D. C., entered appearances for intervenors Associated Natural Gas Co. and Michigan Gas Utilities Co. in No. 77-1719.
 
 
 13
 Before LEVENTHAL and WILKEY, Circuit Judges, and HAROLD GREENE,* District Judge, United States District Court for the District of Columbia.
 
 
 14
 Opinion for the Court filed by Circuit Judge LEVENTHAL, in which Circuit Judge WILKEY and District Judge GREENE join.
 
 
 15
 Concurring opinion filed by Circuit Judge WILKEY.
 
 LEVENTHAL, Circuit Judge:
 
 16
 We consider petitions of natural gas pipeline companies[1] for review of Federal Power Commission[2] rate making orders. The common element in these companion cases is the treatment of "advance payments," pre-payments for future deliveries of natural gas made by the pipelines in the context of an experimental "advance payment program," which was designed to facilitate capital formation by producers to finance development and production of additional gas supplies, thus helping to alleviate the natural gas shortage. In formulating "just and reasonable" pipeline rates in each case, the Commission denied rate base treatment for various expenditures. It deferred inclusion in rate base for advance payments made during the test period and not appro priately expended by the recipient producers within 30-days of the close of that period. We find that the Commission failed to administer the advance payment program with the required flexibility and thus remand the treatment of advance payments for further consideration. In certain respects, as will be noted, we affirm the Commission's other determinations.
 
 
 17
 I. FRONT-END ADVANCE PAYMENTS TO DOMESTIC PRODUCERS
 
 A. General Background
 
 18
 The unhappy saga of the advance payment program has been detailed by this court on other occasions.[3] Conceived as one method of alleviating the impending natural gas shortage, the program was initiated in 1970 and was governed successively by a series of five "advance payment orders" until its termination at the end of 1975.[4] As originally formulated and approved by this court, the program was designed to facilitate capital formation by producers to finance development and production of new gas supplies.[5] It was contemplated that pipelines would provide production capital in the form of pre-payments to producers (advance payments) for future deliveries of natural gas. The order launching the program provided that such payments could be capitalized and included in the pipeline's rate base subject to qualifications, including the requirement that advances must be "reasonable and appropriate."[6] The orders also specified those producer expenditures permissible under the program ("qualifying expenditures"). Producers could be expected to seek advance payments because the advances would provide them with a source of interest-free capital.[7] It was anticipated that pipeline participation in the program also would be assured if pipeline rates could reflect a return on qualifying advance payments.[8] Current purchasers from the pipelineeline would shoulder, in the rates they paid, the "carrying charges" on these interest-free loans to producers, though the benefits from expansion of natural gas supplies would flow to future, not current, rate payers.[9] This departure from the usual rule of public utility regulation (that current rates should reflect the cost of supplying service to current rate payers) was thought justified by the "public interest in enlarging the field supply of natural gas, needed for existing facilities and contracts."[10]
 
 
 19
 The program was conditionally approved by this court in Public Service Commission, State of New York v. FPC (PSC (Advance Payments) I),[11] as a "justifiable experiment in the continuing search for solutions to our nation's critical shortage of natural gas."[12] Resolving doubts in favor of the program, we stressed its experimental character and the need for flexibility and reevaluation as it evolved. We perceived the three advance payment orders that had been issued as of that time[13] "as an on-going effort by the FPC to determine experimentally the proper solution with regard to advance payments to help alleviate the gas shortage," and we were "impressed with the fact that the FPC (had) demonstrated a willingness to assimilate criticism . . . and adjust its treatment of advance payments to conform with the realities of the natural gas market."[14] We emphasized that the agency, in reaching "an accommodation of conflicting interests," was "making policy decisions of the type it was created to make."[15] But this judicial approval was predicated on the Commission's willingness to continue to respond to "the realities of the natural gas market" and to modify the program in light of accumulated experience. We reiterated these concerns in our response to New York Public Service Commission's petition for rehearing.[16]
 
 
 20
 The advance payment order approved by our March 1972 ruling in PSC (Advance Payments) I expired at the end of that year. It was replaced in turn by the two orders pertinent to the instant cases, Order No. 465,[17] governing advance payments made during 1973, and Order No. 499,[18] governing the 1974-75 period. When the program again came before this court in Public Service Commission, State of New York v. FPC (PSC (Advance Payments) II ),[19] we ruled that the Commission had failed in its obligation "to engage in 'meaningful review, analysis and evaluation' of the experience under the advance payments program"[20] and to "adjust its treatment of advance payments to conform with the realities of the natural gas market."[21] In our view, "(t)he data presented by the Commission as a justification of its repeated extensions of the advance payments program provide(d) an inadequate basis from which 'to determine whether its justifying objectives (were) being satisfactorily met at an acceptable level of ultimate economic cost to the nation's gas consumers.' "[22] Accordingly, we remanded the record for further evidence and consideration by the FPC. In light of its subsequent reevaluation, the agency allowed the program to expire upon termination of Order No. 499 on December 31, 1975.[23]
 
 
 21
 Although the program has been terminated, existing advance payment contracts retain their vitality,[24] and continued administration is required as pipelines file with the FERC for jurisdictional rate increases. In such rate-making proceedings the Commission has been called upon to determine whether specific advance payments qualify for rate base treatment under the terms of the applicable advance payment orders. This is the posture of the cases here under review.
 
 B. Nature of Front-end Advance Payments
 
 22
 The central controversy in these cases involves the temporary exclusion from rate base of certain "front-end advance payments" made in the United States.[25] These are a particular class of "advance payments." In general, the program provided for "advance payments" in the sense that the payments were authorized to be made in advance of the delivery of gas supplies. The focus of concern in these cases is the so-called "front-end advance payment," which identifies a transfer to the producer not only prior to gas deliveries, but also prior to any producer expenditures associated with ultimate production of the gas.
 
 
 23
 An advance payment has two aspects, and provides a dual benefit to the recipient producer. First, it is a Source of capital, which supplements the funds available to producers for development and production expenditures. It is a loan, but one shaped as a pre-payment to be credited against the purchase price of gas that will flow from successful development efforts. Second, it is an Interest-free loan. When an advance payment substitutes for capital raised in financial markets, it relieves the producer of financing costs. There is an extra benefit to the producer in that the rate set for the producer by the Commission incorporates an allowance for financing cost, and no reduction in that rate is required on account of the fact that part of the producer's financing is cost-free.[26] Thus, advance payments provide a "bonus" to producers in the amount of the interest factor, an amount which is never refunded.
 
 
 24
 In the Commission's view, the objective of the advance payment program was to expedite the development of gas supply through the mechanism of providing producers an additional Source of capital. In theory, the increased availability of capital would encourage investment, which in turn would yield additional gas supply. The interest factor, and the "bonus" which it provided to producers, has been construed as a subsidiary element designed to provide incentive for producer participation, a necessary cost to achieve the desired benefit.[27]
 
 
 25
 The Commission has come to focus on front-end advance payments as providing a still further bonus to the producer not only the interest-free availability of funds during use for gas development, but their availability for some period prior to the time of "qualifying expenditure" by the producer. The Commission has recognized that capital formation and the pertinent qualifying expenditure may be facilitated by the transfer of an advance to the producer a "reasonable time" prior to the expenditure. However, the Commission has endeavored through administration of the program to protect rate payers from the cost of advance payments held by producers for any "unreasonable" front-end period. Advance payments that were made (in the Commission's view) an "unreasonable" time prior to their appropriate expenditure have been labeled "extravagant" by the agency. Since the term "extravagant" begs the question, these payments will be referred to in this opinion as "extended front-end advance payments" or "extended front-end advances."
 
 C. The Critical Timing Requirement
 
 26
 Distilled to its essence, this case involves two questions: (1) whether the rate base treatment contemplated by the program was inherently limited to advance payments made no more than a "reasonable time" prior to their appropriate expenditure; and, (2) whether, if such a limitation existed, the Commission acted within its discretion in defining the permissible interval solely in terms of traditional line-of-credit financing practices.
 
 
 27
 The timing element has assumed paramount importance due to the response of both pipelines and producers to the realities of the natural gas market in the context of the advance payment program. In an unregulated economic environment, a period of supply shortage may be expected to stimulate a rise in price until supply and demand are once again in equilibrium. But on sales of natural gas within FERC jurisdiction, both producers and pipelines are foreclosed from an unencumbered response to economic forces. Unless specifically excepted, producers must sell gas, and pipelines must buy it, at regulated rates that may fall well below a "free-market" price.[28] Further, the law imposes on the pipelines an enforceable obligation to resist any temptation to acquiesce in unlawful producer demands and to bid against each other for available supplies of gas by offering higher prices or their equivalents.[29] Still, the sanctions available to the FERC have their limitations, and even in the regulatory context market pressures retain some vitality.[30]
 
 
 28
 The advance payment orders did not specify the permissible interval between the advance and its appropriate expenditure. Perhaps emboldened by this indefiniteness, producers pressed their bargaining advantage, inducing pipelines to make advances long before the funds were used for qualifying expenditures. These advances, certain of which the Commission has labeled "extravagant," and which we refer to as "extended front-end advances," gave producers valuable interest-free funds for their unrestricted use during the interim period. By this mechanism the price of natural gas effectively was raised above the regulatory ceiling.[31] Competition for needed gas supplies motivated pipelines to acquiesce in exorbitant producer demands. The belief (or hope) that the Commission would permit rate-base treatment of extended front-end advances, thus passing on the competitive cost to the rate payers, may have contributed to the pipelines' weakened resistance. Whatever the causes, extended front-end advance payments emerged in the market and are referred to in the testimony of witnesses for the pipelines as a "term of trade" arising during the period relevant to these cases.[32]
 
 
 29
 The Commission has administered the advance payment program to defer inclusion in rate base of a pipeline's front-end advances until the test period in which those advances were used by the recipient producers for appropriate purposes. The Commission has relied on its construction of the general objectives of the program and on the administrative discretion inherent in an announced general policy that it would include in the rate base only those advances found "reasonable and appropriate."
 
 
 30
 The initial advance payment order established Account 166, Advance Payments for Gas, and provided that "advance payments for gas would be recorded as prepayments and unrecovered advance payments would be included in the rate base as part of working capital."[33] Various express conditions limited the advance payments that would be considered for inclusion in rate base. Some of these conditions were modified in the subsequent advance payment orders.[34] Each of the orders stated that "the Commission plans to consider those amounts recorded in Account 166, Advance Payments for Gas, as rate base items, where found reasonable and appropriate."[35] Thus, properly recording an advance in Account 166 was a necessary, but not a sufficient, condition for inclusion in the rate base. The Commission also had to be satisfied that the advance was "reasonable and appropriate."
 
 
 31
 There has been no dispute that the advance payments at issue in these cases complied with the express conditions in the pertinent advance payment orders. What is contested is the Commission's discretion to interpret and administer the "reasonable and appropriate" guideline.
 
 
 32
 Two orders govern the advance payments in these cases. Order No. 465, issued December 20, 1972, governs advance payment contracts made during 1973. It contains an unelaborated statement of the reasonable and appropriate standard.[36] On December 28, 1973, the Commission issued Order No. 499, which governs advance payment contracts made during 1974-75. In that order, responding to public comments raising the critical timing issue, the Commission emphasized the applicability of the "reasonable and appropriate" standard to that issue. It did not adopt a strict timing rule, but instead stated that as a "general policy" advances must be appropriately expended by the producer within a "reasonable time."[37]
 
 
 33
 Huge sums in extended front-end advances were transferred to producers under contracts subject to Order No. 465. Despite the Commission's signal in Order No. 499 that it intended to focus on the critical timing requirement, the flood did not abate.[38]
 
 D. The Administrative Proceedings
 
 34
 The administrative proceedings commenced with separate filings by petitioners for jurisdictional rate increases pursuant to section 4 of the Natural Gas Act.[39] Each filing was initially suspended, then became effective subject to refund.[40]
 
 
 35
 In the ensuing hearings the pipelines proposed that all advance payments made during the test period that complied with the express conditions of the relevant advance payment order should be included in the rate base. The Commission Staff argued that a reasonable timing element was inherent in the reasonable and appropriate standard and that the payment of advances could only be justified as necessary to provide producers a line of credit for current obligations. The Staff relied on the testimony of Robert H. Benna, who stated in part:[41]
 
 
 36
 Based on my experience with Shell, I understand that producers are normally allowed 30 days from the date of billing to pay for contract work and materials. Thus, from the producers' standpoint, receipt of an advance one month prior to the date the related payment is due should allow ample time to pay the bill. The important factor, to the producer, is that he has a commitment by a financially stable pipeline to make advances in amounts and at the time necessary to cover exploration and development costs.
 
 
 37
 In the Staff's view, an advance was not reasonable and appropriate for inclusion in the rate base unless it was appropriately expended by the producer within 30 days of receipt. It was argued that the pipelines' stockholders, rather than their rate payers, should bear the carrying charges on front-end advances paid more than 30 days prior to their expenditure. Adapting this standard to the test-period methodology employed in rate making, the Staff proposed to disallow inclusion of extended front-end advance payments made during the test period but not appropriately expended within 30 days of its close.[42] The Staff would have allowed an exception to this rule when it was demonstrated that a financial savings to the rate payer would result from the terms of a particular advance payment contract that outweighed the added cost of deviation from the 30-day rule.[43]
 
 
 38
 In response, the pipelines submitted extensive evidence of the competitive circumstances obtaining during the period in which the challenged advance payments were made. The pipelines argued that, in this environment, refusal to bid competitively for gas reserves by offering extended front-end advances would have left any hesitant pipeline without gas to meet its commitments, and that such a refusal would have been irresponsible in light of the pipeline's obligations to its customers.[44] Thus, it was argued, an advance made in good faith response to competitive conditions was both reasonable and appropriate and should be fully included in the rate base.
 
 
 39
 The administrative law judges in the proceeding before us, while diverging somewhat in particular results, were congruent with each other in critical aspects.[45] Each was receptive to the competitive conditions justification proffered by the pipelines. Each perceived the express mention in Order No. 499 of the timing requirement as a shift in Commission policy. By and large, each rejected the Staff's 30-day rule.
 
 
 40
 The Commission overruled the initial decisions, adopting the Staff's position that a reasonable timing requirement was inherent in the reasonable and appropriate standard of both Order No. 465 and Order No. 499. In its view, the advance payment program was designed to benefit rate payers by providing capital to finance exploration and development of additional gas supplies and to expedite development of existing reserves. It was not intended to provide a license for pipelines to bid against each other for available gas. The Commission concluded that there was no inherent justification in terms of the purposes of the program for advances made prior to the time they were reasonably required to facilitate qualifying producer expenditures. While these extended front-end advances provided a benefit to producers, no public service benefit could be discerned. In the Commission's view, only one consideration was relevant in determining whether a timing relationship satisfied the reasonable and appropriate standard: the financial requirements of the transaction, I. e., the lag time required to allow a smooth transfer and expenditure of funds. The Commission regarded the Staff's 30-day line-of-credit rule as a well-pleaded presumption, subject to rebuttal, as to producer needs and pipeline abilities. Since there had been no showing by the pipelines that producers required funds more than 30 days prior to appropriate expenditure, nor that pipelines needed more time to finance advances, the Staff's rule was applied to determine inclusion in the rate base.[46] The Commission stated:[47]
 
 
 41
 (W)hile we do not find that a maximum time lag of thirty days between advance and expenditure is necessarily the only reasonable and appropriate standard, it was well pleaded and completely unrebutted. . . .
 
 
 42
 The Commission adopted the Staff's proposal that any advances failing to satisfy the 30-day test would be included in rate base only if the terms of the particular advance payment contract would "save the ratepayer more in advance payment carrying charges than would be saved by insisting upon Staff's 30 day installment rule."[48] The Commission did not consider that its express reference to the timing requirement in Order No. 499 represented a dramatic shift in policy from its earlier orders. Rather, the reference merely highlighted one element of the reasonable and appropriate standard. Thus, the same criteria were applied to both Order No. 465 and Order No. 499 advances.
 
 
 43
 The net effect of the Commission's advance payment determinations was the temporary exclusion from the rate base of advances not satisfying the timing requirement. It is important to note that this was a deferral, not a disqualification. Subsequent filings for rate increases would entail new test periods; ultimately, when the expenditure was in fact made during a test period or within 30 days after its close, the deferred advances would be included in the appropriate rate base. This deferral aspect must be distinguished from outright disqualification resulting when advances failed to satisfy one or more of the express conditions stated in the advance payment orders. Nevertheless, substantial sums were involved and deferral has resulted in considerable losses for the pipelines' stockholders.
 
 
 44
 E. Interpretation of the Advance Payment Orders
 
 
 45
 The pipelines assert that the advance payment orders contemplated the use of extended front-end advance payments as a mode of competition for available supplies of gas. From this it is argued that the Commission's current interpretation constitutes retroactive rule making. The pipelines rely principally on various excerpts from the text of the orders, and draw additional support from language in previous administrative decisions. Moreover, it is asserted that to the extent the Commission's current interpretation might at one time have been a reasonable and legally supportable construction, that approach has been foreclosed by the Commission's repeated renewal of the program without appropriate modification in the face of actual and constructive notice that extended front-end advances had become a term of trade. The express mention of a reasonable timing standard in Order No. 499 is viewed as an inadequate reaction to a crying need. Indeed, the generality of the Commission's response to specific comments is cast as further evidence that the Commission did not intend at the time to curtail extended front-end advances. Finally, as to the Commission's use of Staff's 30-day rule as a presumption subject to rebuttal, petitioners challenge its evidentiary basis, and more fundamentally its premise that the only factor relevant to application of the reasonable and appropriate standard was the financial requirements of the transaction.
 
 
 46
 The essence of petitioner's arguments is this: multiple factors encouraged extended front-end advances, and no specific Commission direction restricted their use. Asserting that each pipeline's good faith business judgment should prevail over the Commission's present interpretation, petitioners propose this clear-cut rule: "the sole test for determining whether the advance payments made under these orders were to be included in rate base as 'reasonable and appropriate' (should have been) whether they were made in order to obtain commitments for additional gas supplies."[49]
 
 
 47
 We find that petitioners' arguments in support of their interpretation are undercut by consideration of the character of the advance payment program as an experimental departure from well accepted and understood principles of regulatory law. The Commission has correctly construed the underlying purposes of the program as it was understood by this court in PSC (Advance Payments ) I & II and has not abused its discretion in discerning a reasonable timing requirement and in rejecting petitioners' "business judgment rule" as the "sole test" for the program's administration.[50] Completely separate, however, is the question whether the Commission, in choosing a manner of administering the reasonable timing requirement, gave due consideration to all pertinent factors. As discussed in section I-F Infra, we conclude that it did not, and remand. But first we turn to those considerations that support rejection of petitioners' business judgment rule.
 
 
 48
 1. Petitioners have the burden of demonstrating an affirmative authorization for extended front-end advances. In Smyth v. Ames,[51] the Supreme Court articulated the guiding principle that "the basis of all calculations as to the reasonableness of rates to be charged by a (public utility) must be the fair value of the property Being used by it for the convenience of the public." Although methods for determining values of rate base items have evolved since Smyth v. Ames,[52] the precept endures that an item may be included in a rate base only when it is "used and useful" in providing service. In other words, current rate payers should bear only legitimate costs of providing service to them. The FPC early adopted the "used and useful" standard and has not departed from it without careful consideration of the wisdom of requiring current rate payers to bear costs of providing future service.[53]
 
 
 49
 One such departure was the advance payment program. At the very least it contemplated that current rate payers would shoulder the costs (I.e., the financing charges) of qualifying advance payments. This was intended to expedite the development of additional gas reserves by providing supplemental sources of capital, which would be used to provide service for future rate payers. Such a modification of the "used and useful" principle was thought justified in view of the discouraging supply forecasts and the general correspondence between classes of current and future rate payers. Consumers would eventually have to bear the costs of developing needed gas supplies. In theory, the advance payment program promised to provide that gas at the lowest ultimate cost.[54]
 
 
 50
 The Commission has taken the position that any departure from such a well-rooted regulatory principle must be affirmatively authorized and that an authorized departure must be presumed limited to its express terms. We agree with the analysis that agency silence in these circumstances must be construed to mean that traditional principles retain their vitality.[55] We are not so clear that authorization for a departure from settled principles must be expressly set forth in an order (as contrasted with what is fairly discernible as the intent of an order), but it must be established with reference to the order.
 
 
 51
 This conclusion allows us to by-pass petitioners' factual assertions that, during the pendency of the program, the Commission had actual and constructive notice that it was widely understood within the industry to be acquiescing in extended front-end advances. It is urged that the Commission's failure expressly to restrict extended front-end advances gave such payments an affirmative blessing, or what is the same thing estops the Commission from now asserting an interpretation contrary to that held by the pipelines. We accept Arguendo petitioners' factual assertions of notice, and reject their proffered conclusion. Though a belief that the agency was cognizant of widespread employment of extended front-end advances may have further encouraged their use, the Commission's inaction cannot be construed to change existing law where the Commission resists such a change and has given no indication that it intended a wholesale abandonment of traditional principles. Any modification of traditional principles broad enough to permit extended front-end advances must be derived from the advance payment orders themselves, not from Commission inaction. Further, since the Commission relies on well-established principles of public utility law, it is not sufficient for petitioners to come forward with some conceivable interpretation of language in the advance payment orders that supports their view. At the very least, the burden must fall on petitioners to demonstrate that a preponderance of the interpretative evidence is favorable to their position.
 
 
 52
 2. The program was intended to provide additional sources of capital to expedite development of gas supplies, not to give license for competition among pipelines. Petitioners attempt to carry their burden of showing an affirmative authorization for extended front-end advances by citing specialized provisions of the advance payment orders, which they construe to support their position. The first problem is that the cited passages, often less than clear, are subject to conflicting interpretations.[56] But a more fundamental difficulty with petitioners' approach is the premise that the underlying purposes of the program were sufficiently ambiguous to admit of an interpretation favorable to extended front-end advances. We find overwhelming the Commission's evidence as to the purposes of the program, as intended by the Commission and as understood by this court in PSC (Advanced Payments ) I. Thus we need not pause to consider in depth the particulars of petitioners' references (and the Commission's strenuous rebuttals) but may proceed to consider the evidence supporting the Commission's narrower view.
 
 
 53
 In the introductory paragraphs to Order No. 441, the advance payment order conditionally approved in PSC (Advance Payments ) I, the Commission stated:[57]
 
 
 54
 In our area rate opinions for Southern Louisiana and Texas Gulf Coast (Opinion Nos. 598, 46 FPC 86, and 595, 45 FPC 674), we recognized that it is the function of a just and reasonable rate for independent producers to elicit requisite gas supply, and that costs, in economic terms, reflect the required level of capital formation to elicit that level. In other words, the just and reasonable area rate in these recent opinions did not consider "non-cost" items. Having acknowledged, as we do, that provisions for special rate treatment of advance payments by pipelines have been justified in the past on the basis of providing additional incentives in this experimental undertaking, we nevertheless seek to avoid separate, non-price incentives as much as possible.
 
 
 55
 A critical shortage of gas exists in the United States; capital formation for gas development is difficult. The objectives of providing capital to accelerate the addition of new gas supplies supports our continuation for the limited period of the rate treatment of advance payments provided herein. We recognize that the just and reasonable area rates for independent producers will hopefully alleviate this gas supply shortage over the long-run; however, for the immediate term, (namely through 1972) our advance payments policy has been designed to increase directly the funds available for the necessary exploration and development effort. It is our intention that rate base treatments for advances included in Account 166 be terminated for advances resulting from contracts executed after December 31, 1972, unless otherwise ordered.
 
 
 56
 The Commission's starting point was its recognition of the role of just and reasonable area rates for producers in "elicit(ing) requisite gas supply." For the long-run, the articulated policy was to incorporate in the certificated rate all required incentives to assure requisite supply; "non-price incentives" were to be avoided "as much as possible." Contrary to this long-term policy, advance payments embodied a "non-price incentive" in the "bonus" inherent in the interest-free loan of capital. Nevertheless, since the Commission recognized that a "critical shortage of gas exist(ed)" and "capital formation for gas development was difficult," the "objective of providing capital to accelerate the addition of new gas supplies" justified continuation "for the immediate term" of a policy "designed to increase directly the funds available for the necessary exploration and developmental effort." It was apparent on the face of the order that the purpose of an advance payment was to provide "reasonable and appropriate" developmental capital for "qualify ing expenditures." Yet, the pipelines argue that the orders approved all extended front-end advances, contrary to the Commission's view that for the extended period between receipt and expenditure many of these advances made no such contribution of developmental capital while providing producers with a non-price incentive of the type the program explicitly sought to avoid "as much as possible." In the face of such a clear expression of limited purpose, we find untenable the argument of the pipelines for carte blanche authority to make advances.
 
 
 57
 One of petitioners' arguments that figures prominently in any defense of the pipelines' behavior asserts that the advance payment program contemplated competition among pipelines for available gas through the use of extended front-end advance payments, which would effectively raise the price of natural gas and thus inevitably contribute, in an indirect way, to the alleviation of the natural gas shortage. The fatal weakness in this argument is that it confuses an incentive with a justification. Certainly the Commission contemplated that the prospect of obtaining additional gas reserves for an individual gas distribution system would encourage a pipeline to offer advance payments.[58] But the mere fact that an advance payment made good business sense to the advancing pipeline was not alone sufficient to authorize its use. Advance payments were not an end in themselves. They were legitimate only insofar as and to the extent that they provided producers with a source of developmental capital for use in qualifying expenditures. In the passage from Order No. 441 quoted above, the stimulating effect on gas supply of the price-incentive aspect of advance payments was expressly Excluded by the Commission as an objective of the advance payment program; rather, the price-incentive aspect was tolerated as a necessary and subsidiary adjunct to the capital-formation objective.
 
 
 58
 The conclusion that the Commission had no intention of encouraging internecine bidding among gas-starved pipelines is fortified by the pervasive tone of the advance payment orders, exemplified by the above-quoted passage, that the overall goal in both the long-run and the immediate-term was to elicit requisite gas supply for the nation As a whole, not for any particular pipeline system at the expense of others.
 
 
 59
 In another provision of Order No. 441, the Commission showed a particularized concern that advances should not be used for competitive purposes but rather should be cost-justified in terms of the consumer benefit derived from furtherance of the program's objectives:[59]
 
 
 60
 Our review of the various comments and available data has persuaded us that advances for exploration and lease acquisition have not (been) shown to be an effective vehicle For stimulating the widespread participation in natural gas production for which their encouragement was intended. Moreover, there is some indication that the availability of advances for such purposes by creating competition among pipelines to make such advances may be having the effect of increasing the amounts expended on lease acquisition without a proportionate improvement in gas supply.
 
 
 61
 The Commission excluded from the category of "qualifying expenditures" advance payments for exploration and lease acquisition since they could be identified as an entire category that did not further the justifying objectives of the program, but were instead fostering undesirable competition among pipelines without an offsetting consumer benefit. When this court affirmed the program in PSC (Advanced Payments) I, we highlighted this adjustment as an example of the Commission's flexibility and willingness to modify the program, which we considered a prerequisite to sound administration.[60]
 
 
 62
 In PSC (Advance Payments) I, we unambiguously understood the program's objective to be the creation of an additional source of capital to facilitate the natural gas development and production necessary to alleviate the gas shortage. In one illustrative passage, we noted:[61]
 
 
 63
 The rationale behind this decision is that the advance payments will help to give the gas producers the necessary investment capital to finance the development and production needed to alleviate the gas shortage, and the pipelines will be encouraged to make such advance payments if they are allowed to include the payments in their rate base, thus virtually simultaneously shifting the cost of the advance payments to the pipelines' customers, the natural gas consumers.
 
 
 64
 There was no hint in PSC (Advance Payments) I that a justifying objective of the program was the encouragement of competition among pipelines for scarce supplies of gas. On the contrary, by consistently referring to "producers," "pipelines" and "consumers" throughout the opinion, we evidenced our conviction that the relevant interests were nationwide in scope, not those of any particular pipeline or its customers.
 
 
 65
 It is a crucial aspect of this case, refuting the pipelines' basic retroactive rule making contention, that the limited purposes of the advance payment program were unambiguously articulated, in both Order No. 441 and in the affirming opinion of this court, well prior to the date of any advance payment contract involved in these cases.
 
 
 66
 In PSC (Advance Payments) I we had made clear that continued approval of the program was dependent on the Commission's ongoing modification and evaluation to assure that the program was accomplishing its ultimate purposes alleviation of the gas shortage at an acceptable cost to the natural gas consumer. This process was undertaken in both Order No. 465 and Order No. 499. In the opening sentence of each, the Commission stated that the focus of its inquiry was "to determine whether the advance payment program (was) stimulating activity toward increasing the supply of natural gas sufficiently to justify the extension of rate base treatment of advances."[62] In Order No. 465 the Commission concluded: "in view of our analysis of all the responses . . . and our review of the program of advances in general, we find that rate base treatment of advances to producers has 'represented a justifiable experiment in the continuing search for solutions to our nation's critical shortage of natural gas.' " (Quoting from PSC (Advance Payments) I )[63] In Order No. 499 the Commission stated: "review of the data . . . indicates that the advance payment program has continued to meet its objectives of bringing additional gas supplies into the interstate market at an acceptable cost to the nation's gas consumers," and "that pipeline advances have continued to accelerate the capital formation which led to the exploration, development and dedication of 10.27 Tcf of proven reserves of natural gas as well as 9.57 Tcf of potential reserves of natural gas to the interstate market."[64] Neither Order No. 465 nor Order No. 499 severed the tie between the objective of capital formation and the authorized use of advance payments. Each Order continued to assess the program in terms of nationwide gas supply, not improvement for some pipeline systems at the expense of others. Again, there was direct evidence that competition among pipelines was not a desirable nor intended effect of the program.[65] Although we found the Commission's review of the data inadequate in PSC (Advance Payments) II, we found no inconsistency of purpose in the Commission's orders and reiterated our understanding of the program as expressed in PSC (Advance Payments) I and in the previous orders.[66]
 
 
 67
 The Commission consistently referred to the purpose of capital formation to accelerate improvement in overall gas supply as the purpose of the program and never put forward the purpose of facilitating for its own sake the enhancement of producer prices through competition among pipelines for available gas supplies. Had the Commission advocated such an objective, we discern no basis on which we would have approved it as permissible under the Natural Gas Act.
 
 
 68
 3. Legal infirmity of a program approving all front-end advances. The Natural Gas Act requires the Commission to anchor its regulation of producers in the maintenance of just and reasonable rates. In Texaco,[67] which issued at a time when the strain of natural gas shortage was acute, the Supreme Court held that the Commission had acted impermissibly in exempting small producers from direct rate regulation and rejected as inadequate the Commission's contention that it was sufficient to regulate small producers indirectly, by reason of the consequences of regulation of pipelines and of large producers. Indirect regulation was permissible, but only when and if the Commission developed safeguards to ensure that the rates paid by pipelines, and ultimately borne by consumers, remained just and reasonable.[68]
 
 
 69
 In Consumer Federation of America v. FPC,[69] we disapproved a program in which the Commission attempted to authorize competitive bidding for needed gas supplies by pipelines experiencing critical short-term supply difficulties. That program granted producers 180-day exemptions from rate limitations and permitted them to enter into contracts with eligible pipelines without risk of refund. The order provided that gas costs "shown to have been required by the public interest" were to be passed on to consumers.[70] We invalidated the program, even though it was proffered as an experiment responding to a supply crisis, since it failed to provide adequate assurance that just and reasonable rates would be maintained. We concluded:[71]
 
 
 70
 (T)he Commission has exceeded its authority under the Act. In essence, it has attempted to remedy the shortfall of supply in the interstate market by authorizing a supplemental injection of large quantities of gas through sales freed from the constraints of meaningful regulation. We reject the FPC's claim that § 7(c) (of the Natural Gas Act) supports this substantial, partial deregulation, and find that the Commission has neglected its rate control responsibilities under the Act. Congress has yet to embrace proposals for deregulation of new gas supplies. Until it acts to alter the present "system of regulation by an agency subject to court review, the courts may not abandon their responsibility by acquiescing in a charade or a rubber stamping of nonregulation in agency trappings."
 
 
 71
 To adopt petitioners' contention, which would validate any "timing" arrangement that a pipeline found justified as a matter of business judgment were it to compete successfully for gas supply in a shortage crisis, would be nothing more nor less than acceptance of a deregulatory approach, a ruling that cannot be reconciled with the teaching of Texaco and Consumer Federation. A producer receiving an extended front-end advance, to use without restriction for a significant period prior to expenditure, is in effect given a sum of money. There is no meaningful distinction between receipt of unrestricted funds for a period and receipt of a sum equivalent to the "return" (at a minimum, interest) procurable from use of the funds. In both circumstances producers will be compensated in excess of certificated rates. The business-judgment rule would permit pure competitive bidding by pipelines using the device of extended front-end advance payments.
 
 
 72
 Had the Commission articulated the approach now advanced by the petitioners as an interpretation, we would have disapproved it as an abdication of the agency's regulatory responsibilities. This is not to say that the deployment of funds must be instantaneous. What is inappropriate is unrestricted transfer for more than a reasonable period a concept to which we shall return.
 
 
 73
 Any permission to transfer advances prior to gas delivery (even as to funds used immediately or in a reasonable time for qualifying developmental expenditures) entailed some variance from the previous situation, in terms of benefit to producer and of cost to pipeline and customer. However, the ultimate cost to the consumer was projected to remain within the just and reasonable range because of the compensating benefit of expedited gas development, and the maintenance of restrictions relating the cost to the benefit.[72] This justification, and these safeguards, were lacking as to the extended front-end advances made without restriction other than the competitive "business-judgment rule."
 
 
 74
 4. Claim of retroactive rule making. The foregoing analysis undercuts petitioners' contention that a reasonable timing requirement amounted to retroactive rule making. The pipelines had fair notice both of traditional regulatory principles and that the advance payment program exception was put forward and affirmed on a basis that did not encompass the departure asserted by petitioners.
 
 
 75
 In Natural Gas Pipeline Co. v. FERC,[73] the Seventh Circuit recently ruled that the Commission's interpretation of the reasonable and appropriate standard to impose a relatively inflexible "30-day rule" constituted impermissible retroactive rule making. It viewed the case as falling within a doctrine, articulated in Bell Aerospace Co. v. NLRB,[74] whereby an agency's broad discretion to announce policy in adjudication is subject to an exception in a case of severe impact and justifiable reliance on contrary agency pronouncements.[75] It stated:[76]
 
 
 76
 The consequences to the appellant of denying rate base treatment to the advances are very severe. It would mean the imposition of a large liability with regard to the advances in the present case. Furthermore, the appellant's entering into these agreements, under these terms, was in reliance upon the prior orders of the Commission, and the policies reflected in those orders, specifically the policies encouraging the advance payment program, with few restrictions, and the promulgation of a flexible standard with regard to the advance-expenditure time relationship. We believe that the aforementioned facts require that the Commission's discretion to proceed by adjudication as opposed to by rulemaking be restricted so as to prevent the imposition of a "30 day rule" in this proceeding.
 
 
 77
 We differ from the Seventh Circuit in that, in our appraisal, the Commission's current interpretation of the limited purpose of the advance payment orders does not reverse a policy that had been the subject of reasonable reliance.
 
 
 78
 The Commission's rulings on appeal are rooted in basic principles of regulation and in petitioners' notice of the limited purpose of the advance payment exception. We do not discern the substantial claim of justifiable reliance that is needed to invoke the Bell Aerospace exceptions.[77]
 
 
 79
 In support of its ruling the Seventh Circuit cited our decision in Consumer Federation:[78]
 
 
 80
 While the factual pattern of Consumer Federation of America, supra, is not identical to the present case, the opinion does demonstrate an effort being made to protect the pipeline companies from the squeeze which results if the pipeline incurs expenses for emergency gas which is not refundable. A very similar type of problem to that discussed in Consumer Federation of America, supra, is present in this case. Through Order No. 499, and the four previous orders, the Commission encouraged a program of advances by interstate pipelines to producers to secure commitments of natural gas. Furthermore, inherent within the Commission's orders was an attitude of experimentation and flexibility as reflected in the "reasonable time" standard which the Commission chose to include in Order No. 499. Nevertheless, in electing to utilize a "reasonable time" standard, by itself, the Commission failed to furnish the pipelines with any sort of guidelines which might be followed in contracting with producers for commitments of gas reserves. Then after the agreements are entered into and the advances made, the Commission wants a "reasonable time" to be defined as "30 days", with the obvious effect of such action being that the pipeline would be forced to absorb huge costs which are not capable of being reflected in its rate base. To follow the course set forth by the Commission would be to contravene the policy expressed by the court in Consumer Federation of America, supra.
 
 
 81
 The Seventh Circuit's citation of our opinion in Consumers Federation is a subsidiary point in its approach, dependent on its major premise of justified reliance. In any event, we did not intend Consumers Federation to express a general solicitude for all pipelines caught in a "squeeze" to obtain gas. In that case there was a wholesale deregulation of producers, and we found that the indefinite indication that pipelines would be held to a "public interest" limit on prices paid was not enough to assure maintenance of just and reasonable rates. In the present case, there was a continuing regulation, not a deregulation, and the advance payment order that was judicially approved articulated a reasonable and appropriate standard which the Commission, and this court, find was not discarded, as to the matter of timing of payments, in favor of a competitive business judgment rule.
 
 
 82
 While we differ from the Seventh Circuit both on the issue of justifiable reliance and on the meaning of Consumers Federation, we agree with that court in its disapproval of the Commission's relatively rigid "30-day rule." We concur in its view that "inherent within the Commission's orders was an attitude of experimentation and flexibility,"[79] which in turn involves flexibility in administration. We develop our views in the next section of this opinion, but interpolate at this point that the remand which we order can be implemented by the Commission with results that do not violate the remand by the Seventh Circuit.
 
 
 83
 F. Improper FERC Administration of the Advance Payment Program
 
 
 84
 We have concluded that the Commission acted within its discretion in rejecting both the pipelines' interpretation of the advance payment orders and their proposed competitive business judgment rule for administration of the "reasonable and appropriate" standard. We now turn to a consideration of the Commission's administration of the "reasonable timing requirement," which in light of the program's justifying objectives was implicit in the reasonable and appropriate standard.
 
 
 85
 We recognize the limited scope of our review function. Although a court may not supplant the Commission's well-reasoned judgments with those more nearly to its liking, it must assure itself that "the Commission has given reasoned consideration to each of the pertinent factors." Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).
 
 
 86
 1. Defining the reasonable timing requirement. In evaluating the timing relationship between an advance payment and its qualifying expenditure, the Commission focused solely on the timing requirements of conventional financing transactions.[80] It relied on the testimony of its staff engineer Robert H. Benna set forth earlier in this opinion.[81] His testimony, based on his earlier employment by Shell, was submitted as evidence that producers could satisfactorily arrange for payment of contract and materials costs on the basis of a continuing commitment and specific payments thirty days in advance of due date. From this the Commission evolved a 30-day line-of-credit approach, which it established as a presumption subject to rebuttal. It found that in the cases before it the rule was unrebutted by evidence of financial inability on the part of either producer or pipeline to arrange for payments due under advance payment contracts to be transferred on a line-of-credit basis. We find the Commission's approach unduly restrictive in that it failed to take account of all factors relevant to the " reasonable timing" inquiry.
 
 
 87
 We agree with the Commission that its advance payment orders do not imply either a competitive business judgment rule as the sole standard for timing of advances, or authority for the extravagant costs of extended front-end advances not accompanied by reasonable controls on the timing of expenditures. However this does not mean that its orders disclosed a requirement that the pipelines adopt the "tight" timing practices of conventional financing transactions employed by producers like Shell in their arrangements with contractors. No strict line-of-credit requirement could fairly be implied from the terms of the advance payment orders. By so restricting the scope of its "reasonable timing" inquiry, the Commission failed to evaluate fully and fairly the reasonableness of the protective mechanisms adopted by particular pipelines to ful fill their obligation of vigilance in the consumers' interest.[82]
 
 
 88
 The advance payment program was accepted by all concerned as an experimental and unconventional method of financing producer expenditures. The program embodied an important element of flexibility. This was a key feature both of our approval of the program in PSC (Advance Payments) I, and of our subsequent remand in PSC (Advance Payments) II. Nothing in the advance payment orders, not even in Order No. 499 with its express reasonable timing requirement, hinted that the pipelines were limited to line-of-credit or other conventional banking practices in the development of practical financing packages that would facilitate capital formation by producers while adequately protecting consumer interests, thus keeping advances within the confines of the program. Order No. 499 provided that as a general policy an advance should be appropriately expended within a reasonable time from "the date such amounts advanced are included in the pipeline's rate base."[83] The language of the order is instinct with latitude.
 
 
 89
 The Commission's failure to take into account the inherent flexibility of the advance payment program was the basis for our ruling in United Gas Pipe Line Co. v. FPC.[84] In that case, involving latitude of choice of financing methods, we vacated the Commission's summary rejection of rate-base treatment for United's complex financing arrangement, which entailed an interest-reimbursement scheme rather than the lump-sum transfer of capital more typical of advance payment contracts. The arrangement contemplated that United would assist the producer to locate sources of developmental capital, and then reimburse the producer's financing costs. In our opinion for remand we noted that we found nothing in the advance payment orders precluding this method of facilitating capital formation.
 
 
 90
 In the pending case involving Transcontinental Gas Pipeline Corporation (Transco),[85] the advance payment contracts "provided for payment by Transco on January 10 and July 10 of each year of the estimated expenditures for the subsequent six months, with adjustments semi-annually and annually to reflect overexpenditures, or underexpenditures, respectively."[86] The Commission did not say one way or the other whether the pipeline acted reasonably in fashioning this procedure as a technique for controlling producer expenditures. Instead, it applied its line-of-credit rationale to exclude from rate base all advances not expended within 30 days of the close of the test period. It appears that Transco's approach of periodic accounting and adjustment, with a semi-annual review of expenditures, constituted a prima facie showing of an effort to tie payments to "qualifying expenditures." We agree with the position of the Public Service Commission of the State of New York, intervenor in the Transco proceeding, that in such a case "the shoe is on the other foot" and it is incumbent upon the Commission to articulate why this attempt to protect the consumers' interest falls outside the zone of reasonableness contemplated by the advance payment orders.[87]
 
 
 91
 We remand the cases before us for a more extensive and flexible inquiry by the Commission into the reasonableness of attempts to protect the rate payers from excessive costs. If it concludes that contracts such as those presented by Transco did provide for reasonable timing protections, the Commission would have latitude as a matter of equitable discretion to conclude that the kind of interval found reasonable in a case such as Transco's could be accepted as a general bench mark, even as to contracts that did not contain precisely the same provisions. On the other hand, based on the circumstances of a particular case, the Commission may determine that a much shorter timing interval was reasonable. For example, we note that in the proceeding involving Tennessee Gas Pipeline Co.,[88] Tennessee transferred $59 million in domestic advance payments to an affiliated producer. These advances were effected within the last 35 days of the test period, involved a mere bookkeeping transfer without restrictions on the timing or nature of expenditures, and to the greater extent were not put to use in qualifying expenditures for many months.[89] The ALJ disallowed the unexpended portion of these advances because in his judgment they did not constitute an arm's length transaction. The Commission reached the same result on a different rationale, deferring rate-base treatment on the basis of the 30-day rule. On remand, the Commission may determine that such advances to affiliated producers present one example of unjustifiable misuse of the advance payment program.[90]
 
 
 92
 It is evident that a broad range of financing practices were employed under the advance payment program. Some may have evidenced a reasonable attempt to protect rate payers from excessive costs; others, perhaps, did not. We do not prejudge the result in any particular case; such determinations are for the Commission in the first instance.
 
 
 93
 In sum, we remand these cases because the Commission failed to apply the proper legal criteria when it administered the "reasonable timing" aspect of the "reasonable and appropriate" standard. The advance payment orders did not require adherence to strict line-of-credit or other conventional banking practices, but rather were instinct with the attitude of flexibility and experimentation that motivated the advance payment program. The Commission correctly determined both that good faith response to competitive pressures was an inadequate justification for advance payments and that the pipelines had a responsibility to protect their rate payers from excessive costs, E. g., to take reasonable steps to ensure that the timing of advances was tied to that of "qualifying expenditures." But the advance payment orders allowed a certain discretion to the pipelines and encouraged them to develop practical financing packages that would facilitate capital formation by producers while adequately protecting consumer interests, thus keeping advances within the confines of the program. Application of the correct legal standard on remand requires consideration of the various factors pertinent to a determination of the reasonableness Vel non of the pipelines' efforts in this direction.
 
 
 94
 2. Latitude on remand. The Commission has latitude under its statute to use its equitable discretion and to choose alternative procedures or mechanisms to formulate and to effectuate its judgment;[91] the result need not require a painstaking readjustment of rate base in each case.
 
 
 95
 The Public Service Commission of the State of New York, an active and helpful participant in all phases of the development, administration, and review of the advance payment program, calls our attention to the interrelationship between the Commission's ruling on the advance payment question and its determination on rate-of-return. In the Tennessee proceeding,[92] the Commission readjusted upwards the return on rate base allowed by the administrative law judge on the basis of a revised assessment of the risks faced by the industry in these times of acute supply shortages. In the Commission's view, the "pendulum has definitely swung in a direction substantially contrary to the interests of the investor. A time of adjustment is clearly called for."[93] One of the risks incurred by the pipelines has been the "regulatory risk" that an experimental program such as advance payments might miscarry, and that administrative readjustment would not prevent substantial adverse impact. Commissioner Smith, whose vote in Tennessee was necessary to form the majority, expressly premised his concurrence on the link between treatment of advance payments and rate of return.[94] On remand the Commission will have discretion to consider this interrelationship in reaching a just result. In the other two cases before us, the rate-of-return issue was settled prior to determination of the advance payment question. If the Commission prefers to use rate of return as the vehicle for adjustment, it may consider whether it should reopen these settlement agreements.[95] Another mechanism for effecting the final just and equitable result is the ordering of only partial refunds, rather than the readjustment of rate base. The Commission retains a broad discretion in such matters.[96]
 
 
 96
 One other significant factor that the Commission may consider in exercising its latitude on remand is the impact on the industry of the entire course of Commission action in the development and administration of the advance payment program.[97]
 
 
 97
 It is appropriate to conclude our discussion of Latitude on Remand, before going on to subsidiary issues, to emphasize that while the court has identified a number of factors for consideration by the Commission, it is aware that the appraisal and weighing of these factors is the function of the agency and not of the court. It is not an encroachment on the agency's ultimate discretion either that the court has identified a number of factors for consideration, or that Judge Wilkey has indicated that in his view a particular emphasis should be given to certain factors. The court's role, permitting intervention for error of law or arbitrary action, still leaves the agency with a function broader in scope than the court's.[98]
 
 
 98
 Although our ruling pertains to the rate-base determinations raised by the petitions before us, the Commission has flexibility to consolidate these with other cases, to engage in rule making, or to adopt other procedures. In the end, the Commission may choose to adopt a simplifying formula in the interests of feasible administration; but such a resolution must reflect a reasoned consideration of all the pertinent factors, demonstrating the flexibility that always has been inherent in the advance payment program.
 
 
 99
 II. OTHER ISSUES IN NO. 77-1496, Et al.,
 
 Tennessee Gas Pipeline Co. v. FERC
 
 100
 We turn to two subsidiary questions raised by the petitions for review.
 
 A. Canadian Advance Payments
 
 101
 The first question is whether the Commission properly excluded from Tennessee's rate base advance payments made to a Canadian producer. We approve the Commission's determination.
 
 
 102
 The Commission affirmed the ALJ's decision to exclude from rate base $37.5 million in advance payments made by Tennessee to an affiliated Canadian producer, for use in exploration and development activities in the Canadian Arctic Islands, a remote area in the northern reaches of Canada.[99] We discern that the principal basis of the Commission's determination was Tennessee's failure to demonstrate "that receipt by the appropriate American consumers of the Canadian gas . . . will most likely occur."[100]
 
 
 103
 The advance payment orders were expressly limited to domestic advances.[101] The Commission stated that "(t)he sole basis for even considering Canadian advance payments is our prior statement that pending a Canadian advance payment rulemaking such advances 'shall be treated on a case by case basis.' "[102] The Canadian advances were made in 1973 and Tennessee sought to have them charged to the contemporaneous rate payers, though it concedes that no gas will be forthcoming until the mid-1980's.[103] These advances were not "used and useful" for providing service to then current rate payers, and traditional rate making principles would call for exclusion from rate base.[104] The Commission's analysis seems to contemplate an exception from traditional principles, permitting rate base inclusion on a showing that a particular advance payment served the same purposes, and promised an equivalent benefit to rate payers, as those envisioned for domestic advances complying with the advance payment orders.
 
 
 104
 The fundamental objective of the advance payment program was to help elicit requisite gas supply by providing capital for expedited development and production during the interim period until an upward revision in producer rates would accomplish this objective.[105] The ends of the program could not be furthered unless the investments that were precipitated by advance payments inured to the benefit of jurisdictional rate payers. For this reason the program expressly assured that rate payers would not be charged for advances that did not produce gas, or that produced gas which did not flow to the advancing pipeline.[106] Similarly, as to Canadian advances, the Commission here required that the gas resulting from such advances must be shown "most likely" to flow to the advancing pipeline's domestic rate payers. This general approach was well within the Commission's broad discretion and consistent with that taken in previous adjudications.[107]
 
 
 105
 More specifically, the Commission concluded that Tennessee had not carried its burden of showing that Arctic Islands gas would "most likely" flow to rate payers in the United States. Several uncertainties remained, E. g.: (1) whether reserves in the Arctic Islands region were sufficient to justify construction of a pipeline; (2) whether, at the time this gas would become available for market, Canada's total reserve situation would justify granting of the necessary export authorizations by the National Energy Board of Canada (NEB); and, (3) whether, assuming the existence of adequate reserves, the NEB would grant the required authorizations, rather than authorizing additional exports from other gas-producing regions, or otherwise modifying Canadian energy policy. As we recently have had occasion to note, in the present era of uncertainty for natural gas supply any attempt to predict NEB export policy is highly speculative.[108] The very existence in this case of a genuine dispute over the interpretation of a series of inconsistent and conflicting NEB reports is sufficient to support the Commission's judgment that the issue is not free from substantial doubt. We will not disturb the Commission's informed judgment when it acts as here, within an area of its special expertise and discretion.
 
 B. Rate of Return
 
 106
 The second subsidiary issue is whether the Commission erred in allowing Tennessee a 13.75% Return on equity.
 
 
 107
 In proceedings before the administrative law judge, Tennessee argued for a 13.35% Rate of return on equity; Staff proposed an 11.6% Return. The ALJ concluded that a return of 12.5% On equity was "reasonably in line with earnings of enterprises with comparable degrees of risk, and which have similar ratios of common equity capital."[109] The Commission set aside this determination and adopted a return of 13.75% In the Commission's view, the "pendulum (had) definitely swung in a direction substantially contrary to the interests of the investor. A time of adjustment (was) clearly called for."[110]
 
 
 108
 New York Public Service Commission argues that the Commission's ruling on rate of return was inextricably bound to its advance payments determination.[111] PSC also challenges the reasonableness of the allowed return on equity. We have suggested that on remand for reconsideration of the advance payments determination, the Commission should again evaluate the rate of return question, which it would have full authority to do even if the allowed return were valid in all respects, FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940). We think it appropriate to refrain from entering a ruling at this time on this issue, pending further consideration on remand.
 
 
 109
 III. OTHER ISSUES IN NO. 77-1712,
 
 
 110
 Transcontinental Gas Pipe Line Corp. v. FERC
 
 
 111
 Two subsidiary issues are raised by Transco's petition for review: (1) whether the Commission erred in excluding from Transco's rate base expenditures for unsuccessful alternative gas supply projects; and, (2) whether the Commission properly rejected an offer of settlement. We affirm the Commission's rulings.
 
 
 112
 A. Expenditures for Alternative Gas Supply Projects
 
 
 113
 The Commission affirmed the ALJ's exclusion from rate base of over $22 million expended by Transco in four unsuccessful projects related to the production of synthetic natural gas (SNG).[112] The pipeline argued that these amounts should be included in rate base to be amortized as expense items for inclusion in cost of service. Thus Transco sought both a return On, and the return of its investments. The Commission found that the expenditures were not "used and useful" in providing service and should not be charged to the rate payers.[113] Since the projects did not produce any jurisdictional gas, this ruling clearly was a proper exercise of discretion.[114] We find without merit the claim that the Commission had established a policy, relied on by Transco, creating an exception from the traditional "used and useful" principle with respect to expenditures for SNG development.[115] The Commission had established such an exception for research and development costs, but the Transco projects failed to qualify for special R & D treatment.[116] These expenditures were prudent investments, argues Transco; however, for rate base inclusion expenditures must satisfy not only the necessary condition of prudent investment but also must be "used and useful" in providing service. The Commission did not abuse its discretion when it applied a policy "that SNG expenditures which do not qualify as R & D can be recovered, if at all, only through the price paid for actual SNG production sold in interstate commerce."[117]
 
 B. Rejection of Transco's Settlement Offer
 
 114
 On the basis of the above reasoning, we affirm the Commission's concise rejection of a settlement offer that proposed to exclude these project costs from rate base, yet to amortize most of them over a five-year period for inclusion in cost of service, thus allowing Transco to recover its unsuccessful investments.[118]
 
 
 115
 Affirmed In Part ; Remanded In Part For Further Consideration.
 
 WILKEY, Circuit Judge, concurring:
 
 116
 I concur in Judge Leventhal's carefully reasoned and skillfully crafted opinion for the court. I add this note as a concurrence-for-emphasis.[1]
 
 
 117
 In Judge Leventhal's opinion for the court the Commission has properly been allowed wide discretion in fashioning a new and more flexible rule on remand. The point I wish chiefly to emphasize is that the Commission on remand must give careful consideration to arguments raised by petitioning pipelines concerning market pressures, the ambiguity of the Commission's orders on timing of payments and the contribution of advance payments to capital development by producers and to enhancement of gas supply. Thus I believe the court's opinion must be read as not allowing the Commission discretion to institute a new rule that is little more forthcoming in its allowances for advance payments than the now-void thirty-day rule.
 
 
 118
 As we have noted, the advance payment program constituted a significant and recognized departure from traditional regulatory principles.[2] This departure was deemed necessary to serve the important public purpose of "facilitat(ing) capital formation by (natural gas) producers to finance development and production of new . . . supplies" in order to "alleviat(e) the impending natural gas shortage."[3] The program aimed to stimulate the process of capital formation by allowing the transfer from pipelines to producers of interest-free sums reasonably targeted for purchase or expenditures for production of identified gas supplies.[4] Natural gas producers were thus relieved of financing costs ordinarily associated with the accumulation of capital for exploration and development of new supplies.
 
 
 119
 With such significant advantages to be gained from advance payments, it is certainly correct, as Judge Leventhal has pointed out, that producers could be "expected" to bargain with the pipelines for advance payments to be made.[5] Likewise, producers could be expected to press the pipelines foradvances to be made on the most favorable terms possible I. e., as long as possible in advance of their eventual "qualifying" expenditure.[6] This pressure for what we have termed "extended front-end" advances[7] was increased because the availability to producers of interest-free advance payments became one of the few negotiable terms of gas supply contracts in the otherwise closely regulated natural gas market.
 
 
 120
 As a result of tight gas supplies during the years of the program at issue here,[8] bargaining attempts of the producing companies met with particular success as pipelines scrambled to secure supplies of gas for customers. Since it was in order to relieve this plight of tight supply that the program was initiated, however, this superior bargaining position of the producers and their consequent bargaining success should have come as no surprise to the Commission.
 
 
 121
 Furthermore, no evidence on the record suggests that contracts providing for advance payments were negotiated covertly. Instead, all available information suggests that the high degree of administrative, judicial, and public scrutiny afforded the advance payment program made the terms of the vast majority of advance payment contracts well known to outside parties, and certainly to the responsible regulators.
 
 
 122
 It is thus particularly astonishing that, as noted in the court's opinion, "(t)he advance payment orders (issued by the Commission during the program) did not specify the permissible interval between the advance and its appropriate expenditure."[9] Order No. 465 contained what has properly been described as a totally "unelaborated statement" that advance payments would be allowed only where "reasonable and appropriate," with no specific reference to the critical issue of How long in advance of designated use such payments could be made.[10] Subsequently, Order No. 449 made a completely unimpressive advance toward specificity by declaring that only those advances made within a "reasonable time" of eventual expenditure would be allowed.[11] Until long after the expiration of the advance payment program, therefore, the Commission through its applicable Orders provided only the most cryptic and ambiguous guidelines concerning the issue central to the present litigation.[12]
 
 
 123
 It thus was practically inevitable that the "flood" of advance payments propelled by Order No. 465 did not abate during the time between the two advance payment orders, or thereafter.[13] The Commission bears much responsibility for this situation, for the opacity of the Commission's orders on the issue of permissible timing could only have contributed to the disruptive effect of advance payment bargaining on the otherwiser wise tightly metered minuet of producers, pipelines, consumers, and regulators.[14]
 
 
 124
 The court's opinion has bent over backward to emphasize that the lack of clear regulatory guidance weakened the resistance of pipelines to the "untoward advances" of producers in eliciting extended front-end payments by pipelines.[15] We have been somewhat less definite, however, in suggesting the extent of the relief that should be afforded the pipelines on remand. We have noted that the objective of the advance payment program was to facilitate the development of capital by producers in order to enhance gas supply,[16] and that advance payments by definition involve the transfer of capital from pipelines to producers.[17] We have also noted the argument of the pipelines that all advance payments must be sustained for reason of such a capital contribution, and the contrary argument of the Commission that no allowance should be made for many payments that "for the extended period between receipt (by the producers) and expenditure . . . made no . . . contribution of developmental capital (for 'qualifying expenditures') while providing producers with a non-price incentive of the type the program explicitly sought to avoid 'as much as possible.' "[18]
 
 
 125
 The opinion of the court, however, adopts a middle position. While rejecting the pipeline's argument for carte blanche authority to make advances,[19] we have also rejected the Commission's overly narrow view of the role of advance payments in enhancing capital formation and gas supply. Any front-end advance payment, according to this court's definition, is one made prior to its use for "qualifying expenditures."[20] Also we have noted that only a subclass of front-end advance payments may properly be disallowed current rate base treatment. This class of payments on remand will necessarily be smaller than that excluded by the Commission according to the thirty-day rule. Thus we have not determined that every advance is insupportable for the simple reason of its payment prior to expenditure; instead, we urge strict scrutiny only of those payments that may have been "extravagant" because they were made Too long in advance of qualifying expenditures.
 
 
 126
 We reach this conclusion, I believe, in part because payments made at any interval (whether thirty days or much longer) in advance of qualifying expenditures inevitably enhanced the formation of capital in the hands of producers, and, unless diverted eventually for other "nonqualifying" purposes, may have facilitated the development of new gas supplies by reenforcing the capital foundation of the producing firms and freeing other funds for immediate productive use. It will be the task of the Commission on remand to define with some specificity and with greater latitude than previously those advance payments that were, and those that were not, "reasonable and appropriate" in conforming to the stated objectives of the program in thus aiding capital development for the purpose of enhancing gas supplies.
 
 
 127
 I have some difficulty, however, with the court's discussion of the undesirable consequences of competition among pipelines for supplies of gas. Though bidding among pipelines for gas by offering advance payments inevitably had the effect of raising prices, it cannot lightly be assumed that an increase in prices did not lead to a corresponding increase in supply. As a general matter, only in a situation of total inelasticity of supply can an increase in prices not be expected to lead to a corresponding increase in supply. No such situation of total inelasticity has been demonstrated here, and as Judge Leventhal notes, "(E)ven in the regulatory context market pressures retain some vitality."[21] Thus it is clearly within the purview of our decision for the Commission to give close consideration to the extent to which bidding for gas supplies had the effect of raising prices and thus enhancing natural gas supply, in keeping with the overall goals of the advance payment program. I believe that the burden of proof rests with the Commission to demonstrate that the new rule it derives on remand distinguishes effectively between those advance payments that reasonably could, and those that reasonably could not lead to an increase in supply commensurate with any increase in price.
 
 
 128
 The Commission on remand will also want to take careful note of the losses incurred by the pipelines as a result of the Commission's rate base ruling. Though Judge Leventhal has noted for the court that the Commission's action to date has been to defer, rather than indefinitely to disqualify certain advance payments for rate base, he has also noted that "substantial sums were involved" and that "deferral has resulted in considerable losses for the pipelines' stockholders" because of interest lost during the period of deferral.[22] Such losses are not to be taken lightly, and clearly a very close question is presented as to whether these losses are substantial enough to bar the admittedly retroactive clarification by the Commission of the ambiguous language of its earlier orders on the issue of timing.[23]
 
 
 129
 The Commission will also wish to consider the equities in specific cases of a denial of current rate base to pipeline companies that may have exercised reasonable judgment in making advance payments in the context of tight gas supplies and ambiguous regulatory guidance. The pipelines have made out a convincing case that their responsibility to obtain adequate supplies for consumers during a period of scarce supply compelled them to "bid competitively for gas reserves by offering extended front-end advances."[24] Though we have not endorsed application of any "competitive business judgment" rule in this case, we have noted that circumstances may be "anticipate(d) . . . where a pipeline's investors might determine in their sound business judgment that they should take the risks associated with obtaining needed gas supplies, at least where there is a colorable legal argument that . . . (the) expenditures are permissible."[25]
 
 
 130
 I believe that under the circumstances of this case there was at least a "colorable legal argument" that many of the advance payments made would subsequently be approved by the Commission, and that any exercise of sound judgment by pipeline companies in weighing factors of consumer demand, scarce supply, and ambiguous regulation must not be lightly rebuffed by the Commission on the basis of an imputed greater wisdom of hindsight.
 
 
 131
 All of the considerations discussed above I understand to be subsumed within the court's instruction that the Commission on remand devise a new and more flexible rule concerning advance payments. As noted in the court's opinion: "The advance payment orders . . . were instinct with the attitude of flexibility and experimentation" and "allowed a certain discretion to the pipelines and encouraged them to develop practical financing packages . . . ."[26] Though the pipelines have erred in arguing for an overbroad and overgenerous rule of universal allowances,[27] they certainly have not erred in resisting the Commission's correspondingly narrow and excessively rigid thirty-day rule. As has been made amply clear in the court's opinion, there is nothing pernicious about advance payments Per se ;[28] instead, I believe, only those advance payments that overstrain the bounds of reasonableness may be denied current rate base treatment by the Commission. Having failed once, a serious burden rests with the Commission to buttress its new rule with reasoned support.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976)
 
 
 [1]
 In addition to the principal pipeline petitioners, Tennessee Gas Pipeline Company (No. 77-1496) ("Tennessee"), Transcontinental Gas Pipe Line Corporation (No. 77-1712) ("Transco"), Michigan Wisconsin Pipe Line Company (No. 77-1719) ("Michigan-Wisconsin"), there are petitions by the Interstate Natural Gas Association of America (No. 77-1653) ("INGAA"), Columbia Gas Transmission Corporation (Intervenor in No. 77-1496 Et al.) ("Columbia"), and the Public Service Commission of the State of New York (No. 77-1498) ("PSC"). There also have been various cross-interventions by the parties
 
 
 [2]
 The Federal Power Commission went out of existence in the fall of 1977. The Department of Energy Organization Act of 1977, P.L. 95-91, 91 Stat. 565, Codified at 42 U.S.C. §§ 7101 Et seq. (1978), transferred most of the FPC's functions, including its rate making authority under both the Federal Power Act and the Natural Gas Act, to the newly created Federal Energy Regulatory Commission (FERC). 42 U.S.C.A. §§ 7172(a)(1)(B), (C) (1977). This change in administration has no effect on the instant litigation, save for the appropriate substitution of parties
 
 
 [3]
 See The Second National Natural Gas Rate Cases, 186 U.S.App.D.C. 23, 59-64, 567 F.2d 1016, 1052-57 (1977), Cert. denied, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978); United Gas Pipe Line Co. v. FPC, 179 U.S.App.D.C. 274, 276, 551 F.2d 460, 462 (1977); Michigan Wisconsin Gas Pipe Line Co. v. FPC, 171 U.S.App.D.C. 352, 353-54, 520 F.2d 84, 85-86 (1975); Public Service Com'n, State of N.Y. v. FPC, 167 U.S.App.D.C. 100, 511 F.2d 338 (1975) (hereafter cited as "PSC (Advance Payments) II"); Public Service Com'n, State of N.Y. v. FPC, 151 U.S.App.D.C. 307, 467 F.2d 361 (1972) (hereafter cited as "PSC (Advance Payments) I" )
 
 
 [4]
 Order No. 410, Accounting and Rate Treatment of Advance Payments to Suppliers for Gas and Amending F.P.C. Form No. 2, Docket No. R-380, 44 FPC 1142 (1970) (governing advances made pursuant to contracts entered after October 2, 1970) (hereafter cited as "Order No. 410"); Order No. 410-A, Accounting and Rate Treatment of Advance Payments to Suppliers for Gas, and Amending F.P.C. Form No. 2, Docket No. R-380, 45 FPC 135 (1971) (amending the treatment of advance payments governed by Order No. 410) (hereafter cited as "Order No. 410-A"); Order No. 441, Accounting and Rate Treatment of Advance Payments to Suppliers for Exploration and Lease Acquisition of Gas Producing Properties, Docket No. 4-411, 46 FPC 1178 (1971) (governing advance payments contracts executed between November 10, 1971 and December 31, 1972) (hereafter cited as "Order No. 441"); Order No. 465, Accounting and Rate Treatment of Advance Payments Included in Account 166, Advance Payments for Gas Development and Production, Docket No. R-411, 48 FPC 1550 (1972) (governing contracts executed between January 1, 1973 and December 31, 1973) (hereafter cited as "Order No. 465"); Order No. 499, Accounting and Rate Treatment of Advances Included in Account No. 166, Advances for Gas Exploration, Development and Production, Docket No. RM74-4, 50 FPC 2111 (1973) (governing contracts executed between January 1, 1974 and December 31, 1975) (hereafter cited as "Order No. 499")
 
 
 [5]
 PSC (Advance Payments) I, supra note 3, 151 U.S.App.D.C. at 309, 467 F.2d at 363
 
 
 [6]
 Order No. 410, Supra note 4, 44 FPC at 1144. Advance payments were to be drawn down and removed from Account 166, Advance Payments for Gas, as gas deliveries commenced or as the pipeline was reimbursed in consideration other than gas. The significant express qualifications governing advances under the various orders are described in note 34 Infra
 
 
 [7]
 See Order No. 465, Supra note 4, 48 FPC at 1554
 
 
 [8]
 The "cost" to the pipeline of an advance payment was the cost of financing the amount advanced, a factor principally determined by interest rates in the bond market. The "cost" to rate payers was determined by the rate of return allowed on the pipeline's rate base. A differential between the allowed rate of return and the prevailing interest rate in capital markets provided some opportunity for successful arbitrage, but as interest rates rose during the relevant period this incentive was minimized. The principal incentive for pipeline participation lay in their ability to secure gas reserves for the future while transferring to the rate payer the added cost of making pre-payments (advance payments) for the gas
 
 
 [9]
 Qualifying advance payments had to be made prior to deliveries under the advance payment contract. See, e. g., Order No. 465, Supra note 4, 48 FPC at 1556. Substantial lag times were inevitable between the date of the advance and its full repayment in gas, especially if the advance were made to fund exploration or other pre-production producer expenditures. See id. at 1553 (FPC assumption that all pre-Order No. 441 advances are fully recovered on the average in five years, with a one-year lag between the advance and commencement of recoupment). Where "front-end" advances were involved, the time between the date of advance and its full repayment in gas was considerably extended. For example, most of the advance payments excluded for a period from Tennessee's rate base, though advanced in 1973, were not even fully utilized by the recipient producers until 1975, and the weighted average lag time between the end of the applicable test period and the date when Tennessee's producers would require the advance to cover costs was calculated to be 22.8 months. JA in No. 77-1496, Et al. at 254, 256 (testimony of Staff witness Robert H. Benna, unrebutted by petitioners in this respect); See FERC Br. in No. 77-1496, Et al. at 36
 
 
 [10]
 PSC (Advance Payments) I, supra note 3, 157 U.S.App.D.C. at 316, 467 F.2d at 370
 
 
 [11]
 151 U.S.App.D.C. 307, 467 F.2d 361 (1972)
 
 
 [12]
 Id. 151 U.S.App.D.C. at 317, 467 F.2d at 371 (on petition for rehearing)
 
 
 [13]
 Orders No. 410, No. 410-A, and No. 441, Supra note 4
 
 
 [14]
 PSC (Advance Payments) I, supra note 3, 151 U.S.App.D.C. at 313, 467 F.2d at 367
 
 
 [15]
 Id
 
 
 [16]
 Id. 151 U.S.App.D.C. at 317, 467 F.2d at 371:
 One of the important factors in reaching our decision was the temporary character of the FPC order under review (Order 441 remains in effect only through 31 December 1972), and our belief that it represented a justifiable experiment in the continuing search for solutions to our nation's critical shortage of natural gas. . . . Fundamental to the concept of any experiment is the assumption that the data developed from the experience thereunder will be subjected to meaningful review, analysis, and evaluation before the experimental practice is allowed to continue or to become institutionalized as a more permanent procedure. . . . We would accordingly expect that the FPC will not continue, or extend the effective date of, the practices authorized by Order 441 without further proceedings in which New York and all other interested parties will be given the opportunity to demonstrate the effectiveness or the futility of this experiment.
 
 
 [17]
 See note 4 Supra
 
 
 [18]
 See id
 
 
 [19]
 167 U.S.App.D.C. 100, 511 F.2d 338 (1975)
 
 
 [20]
 167 U.S.App.D.C. at 104, 511 F.2d at 342 (quoting from PSC (Advance Payments) I statement on petition for rehearing, note 16 Supra )
 
 
 [21]
 167 U.S.App.D.C. at 105, 511 F.2d at 343
 
 
 [22]
 167 U.S.App.D.C. at 104, 511 F.2d at 342 (quoting from PSC (Advance Payments) I Statement on petition for rehearing, note 16 Supra )
 
 
 [23]
 See Advances for Gas Exploration, Development and Production, Docket Nos. R-411 & RM74-4 (orders issued Dec. 31, 1975 and Feb. 27, 1976)
 
 
 [24]
 Id
 
 
 [25]
 The first of the two advance payment orders pertinent to these cases restricted its coverage to advances made to producers within the lower 48 states. Order No. 465, Supra note 4, 50 FPC at 1555. The second pertinent order made accommodation for advances to producers in Alaska. Order No. 499, Supra note 4, 50 FPC at 2116
 One of these cases, No. 77-1496 Et al., also involves exclusion from rate base of advances made to Canadian producers, but the Commission's decision was controlled by different considerations since advances to producers on the North American continent outside the United States were eligible for rate base treatment but only on a case-by-case basis. Advances to Suppliers for Gas Outside Continental United States, Docket No. R-466, 38 Fed.Reg. 1055-56 (1973) (notice of rulemaking). This issue is treated in section II-A Infra.
 
 
 [26]
 See, e. g., JA in No. 77-1712 at 148-49, Transcontinental Gas Pipe Line Corporation, Docket Nos. RP74-48 and PR75-3, Presiding Administrative Law Judge's Initial Decision on Reserved Issues 31-32 (Dec. 22, 1975) (hereafter cited as "Transcontinental Initial Decision") ("(T)he producer has interest-free use of the funds until the day they must be spent on eliciting gas, and this is a substantial bonus added to the price he will receive for the gas from the pipeline. The pipeline receives no discount upon that price because its funds financed the producer's venture. And the full price, commonly the highest price permissible under FPC regulations, is ultimately paid by the pipeline's customers."); JA in No. 77-1719 at 111, Michigan Wisconsin Pipe Line Co., Docket No. CP70-22, Initial Decision Upon Inclusion of Advance Payments in Rate Base 7 (Feb. 27, 1976) (hereafter cited as "Michigan-Wisconsin Initial Decision"), JA in No. 77-1719 at 111 ("The use of money for a period of time is itself worth money. The advance payments at issue in this proceeding necessarily involve the payment of substantial additional compensation to the producers above and beyond the established price for gas that they may discover and sell to the pipeline.")
 
 
 [27]
 See Order No. 465, Supra note 4, 48 FPC at 1554
 
 
 [28]
 Section 4(a) of the Natural Gas Act, 15 U.S.C. § 717c(a) (1976), provides that "(a)ll rates and charges made, demanded, or received . . . shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful." Section 5, 15 U.S.C. § 717d (1976), authorizes the Commission to review rates and set them at just and reasonable levels. Section 7(c), 15 U.S.C. § 717f(c) (1976), requires that new gas be sold under certificates of "public convenience and necessity." The Commission's power to exempt producers and pipelines from the regime of just and reasonable rate regulation is limited. See generally, FPC v. Texaco Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); Consumer Federation of America v. FPC, 169 U.S.App.D.C. 116, 515 F.2d 347, Cert. denied, 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975)
 
 
 [29]
 See Natural Gas Act, §§ 20, 21, 15 U.S.C. §§ 717s, 717t (1976)
 
 
 [30]
 Pursuant to section 4(e) of the Natural Gas Act, 15 U.S.C. § 717c(e) (1976), the Commission may suspend a filing for a jurisdictional rate for up to five months. At the end of the suspension period, the rate may go into effect, subject to refund. Pipeline expenditures for the purchase of gas beyond just and reasonable prices may be denied reimbursement (I. e., ordered for refund) and the pipeline's investors, rather than its rate payers, may have to bear the disallowed cost. Section 20 of the Act, 15 U.S.C. § 717s (1976), allows the Commission to seek an injunction from a district court to restrain on-going or prospective violations of the Act's provisions. Section 21, 15 U.S.C. § 717t (1976), subjects to criminal penalties "(a)ny person who willfully and knowingly does or causes or suffers to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful," and subjects to modest per diem fines "(a)ny person who willfully and knowingly violates any rule, regulation, restriction, condition, or order made or imposed by the Commission under authority of this chapter." Despite these deterrents to the knowing payment of higher than just and reasonable prices for natural gas, the Commission cannot take the ill-gotten gas away from the offending pipeline once it has flowed to its customers. One may anticipate circumstances where a pipeline's investors might determine in their sound business judgment to take the risks associated with obtaining needed gas supplies, at least where there is a colorable legal argument that questionable expenditures are permissible
 
 
 [31]
 See note 26 Supra
 
 
 [32]
 See, e. g., Opinion No. 769-A, Tennessee Gas Pipeline Company, Docket No. RP73-113, Opinion and Order Denying Rehearing 3 (May 31, 1977) (hereafter cited as "Opinion No. 769-A"), JA in No. 77-1496 Et al. at 394
 
 
 [33]
 Order No. 410, Supra note 4, 44 FPC at 1143
 
 
 [34]
 Order No. 410 encompassed advance payments to independent or affiliated producers for exploration, lease acquisition, development, or production of natural gas, "when such advance payments are to be repaid by delivery of gas." Id. at 1146. Advances had to be fully recovered within a "reasonable period of time following commencement of deliveries," and in any case "within a 5-year period." Id. The rate base account had to be credited by the amount of non-recoverable advances. Id
 Order No. 410-A, Supra note 4, suspended rate-base treatment for advances to affiliated producers for exploration and lease acquisition costs. 45 FPC 135 (1971). Order No. 441, Supra note 4, limited the program to the period ending Dec. 31, 1972, and denied rate-base treatment to all advances for exploration and lease acquisition, as well as payments to both affiliated and independent producers which resulted in a working interest. 46 FPC at 1180-81. Where economic interests other than a working interest were received by a pipeline as a result of an advance payment properly includable in the rate base, any realization therefrom was to be treated so as to reduce the pipeline's cost of service. Id. at 1181. Advance payments might be repaid by delivery of natural gas or by other consideration, and full repayment was required within five years from the date gas deliveries commenced or the date it was determined that recovery would be in other than gas. Id. at 1180.
 Order No. 465, Supra note 4, extended the program for one year and reallowed rate-base treatment of advances for exploration while continuing to deny it for lease acquisition costs. 48 FPC at 1554. Advances by a pipeline to an affiliated producer were eligible for rate base treatment, even if the affiliate obtained a working interest. Id. at 1154-55. Advances had to be fully repaid within five years of the date deliveries commenced, or the date it was determined that repayment would be in other than gas; and the delivery-commencement or alternative-determination date had to be within five years from the date of the advance. Id. at 1153-54. A refund to customers was required if an advance resulted in the finding of proven reserves, gas deliveries commenced, but no gas flowed to the advancing pipelines. Id. at 1554.
 Order No. 499, Supra note 4, extended the program for another two years and expanded its coverage to include Alaskan advances made under future contracts (previously only advances in the lower 48 states where eligible for rate base treatment). 50 FPC at 2115. Advances to independent producers resulting in the acquisition of a working interest were permissible, and economic benefits derived from working interest advances need not be credited against the pipeline's cost of service. Id. at 2114.
 
 
 [35]
 Order No. 410, Supra note 4, 44 FPC at 1144; Order No. 410-A, Supra note 4, 45 FPC at 135 (by incorporation of Order No. 410); Order No. 441, Supra note 4, 45 FPC at 1181; Order No. 465, Supra note 4, 48 FPC at 1555, Order No. 499, Supra note 4, 50 FPC at 2115
 
 
 [36]
 The Order provided: "Consistent with the amendments to Section 154.63 of the Regulations under the Natural Gas Act adopted herein, the Commission plans to consider those amounts allowed in Account 166, as rate base items, where found reasonable and appropriate." Order No. 465, Supra note 4, 48 FPC at 1555
 
 
 [37]
 50 FPC 2111, 2115 (1973):
 (A)s a general policy we shall not consider amounts advanced to be "reasonable and appropriate" for inclusion in rate base where such amounts are in excess of costs for exploration, development and production incurred by the producer within a reasonable time from the date such amounts advanced are included in the pipeline's rate base.
 The Commission declined to formulate specific timing standards, determining instead to "examine each advance on a case by case basis." Accounting and Rate Treatment of Advances Included in Account No. 166, Advance for Gas Exploration, Development and Production, Docket No. RM74-4, Order Denying Rehearing of Order No. 499, 51 FPC 818, 819 (1974).
 
 
 [38]
 A report prepared on the basis of Commission files calculated that a total of $5.5 billion had been committed in advance payments as of February 1, 1976. Of that total it would appear that little more than 1% Was advanced on a 30-day line-of-credit basis. INGAA Br. in No. 77-1496, Et al. at 5 n.3; JA in No. 77-1496, Et al. at 370. Of this total, more than $4.2 billion in front-end advance payments were reportedly committed between August, 1973 and February, 1976. JA in No. 77-1496 Et al. at 370
 
 
 [39]
 15 U.S.C. 717c (1976)
 
 
 [40]
 Filing by Tennessee Gas Pipeline Co. (No. 77-1496 Et al.) occurred on June 15, 1973, was accepted and suspended on August 1, and became effective subject to refund on January 1, 1974. JA in No. 77-1496 Et al. at 321
 Transcontinental Gas Pipeline Corp. (No. 77-1212) made its pertinent filing on July 16, 1974. It was accepted and suspended by the Commission on Aug. 31, 1974, with the rates becoming effective subject to refund on Feb. 1, 1975. JA in No. 77-1712 at 165-66.
 Michigan Wisconsin Pipeline Co. (No. 77-1719) filed for its rate increase on November 15, 1974. The rates became effective subject to refund on January 1, 1975. JA in No. 77-1719 at 104.
 
 
 [41]
 JA in No. 77-1712 at 64; JA in No. 77-1719 at 42-43; See JA in No. 77-1496 Et al. at 6-7
 
 
 [42]
 JA in No. 77-1496 Et al. at 309; JA in No. 77-1712 at 145-46; JA in No. 77-1719 at 108-11. It may be noted that this approach allowed certain advances to be included in rate base even if they were expended more than 30 days after receipt. Though an advance made on the last day of a one year test period would have to have been expended within 30 days to qualify, advances made on the first day of that test period would qualify if expended anytime within the subsequent 13 months. Thus it might be argued that the effective timing requirement (i. e., the average permissible front-end lag time) was considerably in excess of 30 days
 
 
 [43]
 JA in No. 77-1712 at 145; JA in No. 77-1719 at 116
 
 
 [44]
 See Opinion No. 769, Tennessee Gas Pipeline Company, Docket No. RP73-113, Opinion and Order Affirming in Part and Reversing in Part Initial Decision Establishing Just and Reasonable Pipeline Rates (July 9, 1976) (hereafter cited as "Opinion No. 769") (opinion of Commissioner Holloman, dissenting at 2) ("A pipeline such as Tennessee faced with this competitive climate would be remiss in its attempts to attach new supplies of gas on behalf of itself and its customers if it did not use this tool to enter into new gas supply contracts.") JA in No. 77-1496, Et al. at 359; Opinion No. 769-A, note 32 Supra (opinion of Commissioner Holloman, dissenting, at 1) ("For the plain fact is this program was thrust upon the pipeline companies, leaving them little choice but to negotiate for these arrangements or abandon the field to competing pipelines. Obviously, considered in the context of growing curtailments and deteriorating gas supply, the latter course would have evidenced a willful disregard of Tennessee's responsibilities to its customers bordering on negligence."), JA in No. 77-1496 Et al. at 406
 
 
 [45]
 Tennessee sought inclusion in rate base of nearly $197 million in advance payments to domestic producers, all governed by Order No. 465. JA in No. 77-1496 Et al. at 313. The administrative law judge rejected Staff's 30-day rule as "unduly restricted and arbitrary." Id. at 311. In general, the pipeline's unchallenged good faith and business judgment was found to qualify advances as reasonable and appropriate. Id. at 310-11. However, the ALJ perceived an important difference with respect to $59 million of the total, comprising advances to affiliated producers. He found that these advances did not constitute an "arm's length transaction" since the unearmarked affiliate funds were advanced near the close of the test period and were available for uses unrelated to gas development. Approximately $28 million in unexpended intra-corporate domestic advances were excluded from rate base. Id. at 314-15
 Transco's advances, totaling approximately $15 million, were governed in part by Order No. 465 and in part by Order No. 499. The pipelines' business judgment rule was accepted with respect to the Order No. 465 advances. JA in No. 77-1712 at 147. However, the ALJ viewed the articulation in Order No. 499 of a reasonable timing requirement as a sharp change in Commission policy. All Order No. 499 advances not expended at the close of the test period were excluded from rate base. Id. at 152-54.
 Approximately $11.5 million in advance payments, governed by Order No. 499, are involved in the Michigan-Wisconsin proceeding. The ALJ found that all the front-end advances, including those made to an affiliated producer, satisfied the reasonable timing requirement even though they did not comply with Staff's 30-day rule. JA in No. 77-1719 at 112-14.
 
 
 [46]
 Opinion No. 769, Supra note 44, at 29-34, JA in No. 77-1496, Et al., at 348-51; Opinion No. 769-A, Supra note 32, at 4-10, JA in No. 77-1496 Et al. at 395-401; Opinion No. 801 Transcontinental Gas Pipe Line Corp., Docket Nos. RP74-48 & RP75-3, Opinion and Order Affirming in Part and Reversing Initial Decision on Reserved Issues and Establishing Just and Reasonable Pipeline Rates 21-23 (May 31, 1977) (hereafter cited as "Opinion No. 801"), JA in No. 77-1212 at 185-87; Michigan Wisconsin Pipe Line Co., Docket No. CP70-22, Et al., Order Reversing Initial Decision 2-4 (June 3, 1977) (hereafter cited as "Michigan-Wisconsin Order"), JA in No. 77-1719 at 116-20. The Commission declined to differentiate between advances to affiliated and to non-affiliated producers, thus differing from the reasoning of the ALJ in the Tennessee proceeding. But the same result was achieved exclusion of unexpended intracorporate advances from the rate base on the basis of the 30-day standard
 
 
 [47]
 Opinion No. 769-A, Supra note 32, at 5, JA in No. 77-1496, Et al. at 396; Michigan-Wisconsin Order, Supra note 46, at 4, JA in No. 77-1719 at 119
 
 
 [48]
 Opinion No. 801, Supra note 46, at 22, JA in No. 77-1712 at 186; See Opinion No. 769, Supra note 44, at 32, JA in No. 77-1496, Et al. at 351; Michigan-Wisconsin Order, Supra note 46 at 3, JA in No. 77-1719 at 118
 
 
 [49]
 Tennessee Br. in No. 77-1496, Et al. at 15 (emphasis deleted)
 
 
 [50]
 Although we employ the term "business judgment rule" to characterize the pipelines' suggested approach, we do not intend to import the extensive jurisprudence that has developed in connection with use of the term as a standard for measuring the duty of corporate directors and other fiduciaries
 
 
 [51]
 169 U.S. 466, 546, 18 S.Ct. 418, 434, 42 L.Ed. 819 (1898) (emphasis supplied)
 
 
 [52]
 See FPC v. Hope National Gas Co., 320 U.S. 591, 605, 64 S.Ct. 281, 88 L.Ed. 333 (1944); FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 599-608, 62 S.Ct. 736, 86 L.Ed. 1037 (1942) (concurring opinion of Black, Douglas and Murphy, JJ.); Driscoll v. Edison Light & Power Co., 307 U.S. 104, 122-24, 59 S.Ct. 715, 83 L.Ed. 1134 (1939) (Frankfurter, J., concurring); McCart v. Indianapolis Water Co., 302 U.S. 419, 423-41, 58 S.Ct. 324, 82 L.Ed. 336 (1938) (Black, J., dissenting); Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Com'n., 262 U.S. 276, 289-312, 43 S.Ct. 544, 67 L.Ed. 981 (1923) (opinion of Brandeis, J.); City of Detroit v. Panhandle Eastern Pipe Line Co., 3 FPC 273, 278-80 (1942); Chicago District Electric Generating Corp., 2 FPC 412, 416-20 (1941)
 
 
 [53]
 E. g., Mississippi River Fuel Corp., 4 FPC 340, 344 (1945) ("It has been the general practice of this Commission to determine the rate base by ascertaining the net investment in the gas plant used and useful in rendering service, and adding a reasonable allowance for working capital."); Chicago District Electric Generating Corp., 2 FPC 412, 420 (1941). The "used and useful" standard was expressly incorporated into the depreciation provisions of section 9 of the Natural Gas Act, 15 U.S.C. § 717h (1976), which provide in part: "The Commission may from time to time ascertain and determine, and by order fix, the proper and adequate rates of depreciation and amortization of the several classes of property of each natural-gas company used (and) useful in the production, transportation, or sale of natural gas."
 Compare Cities Service Gas Co., 3 FPC 459, 490 (1943) ("While a strict interpretation of rate making principles might require no allowance for return and depreciation on the Hugoton (pipeline) project until it is completed and in service, we believe that, because of the urgent necessity for relieving the gas transportation shortage during the war emergency, it is in the public interest presently to make such an allowance in connection with the interim reduction of rates ordered in this proceeding."); General Policy and Interpretations, Inclusion of Construction Work in Progress in Rate Base, 41 Fed.Reg. 51392, 51393 (1976) ("The question of the proper treatment for ratemaking purposes of capital expenditures which have not yet been placed in service is one which is subject to a play of conflicting principles. On the one hand, public utility regulation has generally adhered to the principle that a rate base should only include items which are 'used and useful.' On the other hand, regulation has also always recognized that the expense of financing construction to serve customers is itself a legitimate expense which must ultimately be borne by the ratepayers."); Order No. 566, Changes in Accounting and Rate Treatment for Research, Development and Demonstration Expenditures, Docket No. RM76-12 (June 3, 1977). Regulations permitting rate-base treatment of R & D expenditures, with certain qualifications, are codified at 18 CFR 201 (103) (1978).
 
 
 [54]
 PSC (Advance Payments ) I, supra note 3, 151 U.S.App.D.C. at 316, 467 F.2d at 370
 
 
 [55]
 See NLRB v. Majestic Weaving Co., 355 F.2d 854, 860 (2d Cir. 1966); NLRB v. International Bhd. of Teamsters, 225 F.2d 343, 348 (8th Cir. 1955). See Standard Oil Co. v. Dept. of Energy, 596 F.2d 1029 at 1040-56 (Em.App.1978) (reaching a different result where there existed no previously well-settled rule)
 
 
 [56]
 For example, petitioners place substantial reliance on the statement in Order No. 441, Supra note 4, that: "Advances may be recorded in Account 166 and Shall be included in rate base where such payments are reasonable, necessary and appropriate in order to contract for gas supplies by agreement executed not later than December 31, 1972." 46 FPC at 1180 (emphasis supplied). Petitioners focus our attention on the facially directory language. It may be noted first that following this statement, the order iterates, "the Commission plans to consider those amounts recorded in Account 166, Advance Payments for Gas, as rate base items, where found reasonable and appropriate." Id. at 1181. An harmonious construction of these two sentences is that need "to contract for gas supplies" is a necessary, but not a sufficient condition for inclusion in rate base. We may note secondly that the key ingredient added to the order by the relied-upon sentence is specification of the order's termination date as December 31, 1972. Concentration on the sentence's primary purpose may have caused the Commission to overlook careless drafting. Insofar as petitioners' argument is premised on a justifiable reliance on the directory language, it is undercut by the Commission's paraphrase of the critical sentence in the Order of Clarification and Denial of Rehearing or Modification, 47 FPC 57, 58 (1972):
 Tennessee is uncertain as to whether a return will be allowed on the unamortized balances of non-recoverable advances. It is our stated position in the fourth paragraph of page 1180 of Order No. 441, that advances recorded in Account 166 May be included in rate base where such payments are reasonable, necessary and appropriate in order to contract for gas supplies by agreement executed not later than December 31, 1972. There is no provision for the inclusion in rate base of amounts that must be eliminated from Account 166.
 
 
 [57]
 Order No. 441, Supra note 4, 46 FPC at 1179-80
 
 
 [58]
 See note 8 Supra
 
 
 [59]
 Order No. 441, Supra note 4, 46 FPC at 1180 (emphasis supplied)
 
 
 [60]
 PSC (Advance Payments) I, supra note 3, 151 U.S.App.D.C. at 313, 467 F.2d at 367
 
 
 [61]
 Id. 151 U.S.App.D.C. at 309, 467 F.2d at 363. See also id. 151 U.S.App.D.C. at 317, 467 F.2d at 371 (on petition for rehearing)
 
 
 [62]
 Order No. 465, Supra note 4, 48 FPC at 1550; Order No. 499, Supra note 4, 50 FPC at 2111
 
 
 [63]
 48 FPC at 1553
 
 
 [64]
 50 FPC at 2112-13
 
 
 [65]
 In Order No. 465, Supra note 4, the Commission stated:
 It is clear then that advances for exploration and lease acquisition have resulted in significant production activity. However, the comments indicate that advances for lease acquisition may have been a contributing factor in bidding up of the price of leases. Therefore we shall henceforth allow advances for exploration in rate base while continuing to exclude advances for lease acquisition from rate base.
 
 
 [48]
 FPC at 1554 (1972)
 
 
 [66]
 PSC (Advance Payments) II, supra note 3, 167 U.S.App.D.C. at 103-04, 111-13, 511 F.2d at 341-42, 349-51
 
 
 [67]
 FPC v. Texaco Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974)
 
 
 [68]
 Id. 417 U.S. at 401, 94 S.Ct. 2315
 
 
 [69]
 169 U.S.App.D.C. 116, 515 F.2d 347 (1975)
 
 
 [70]
 Order No. 491-B, 50 FPC 1463, 1470 (1973). The program reviewed in Consumer Federation was governed by Order No. 491, 50 FPC 742 (1973); Order No. 491-A, 50 FPC 848 (1973); Order No. 491-B, Supra; and Order No. 491-C, 50 FPC 1634 (1973)
 
 
 [71]
 169 U.S.App.D.C. at 129, 515 F.2d at 360, Quoting PSC (Advance Payments) II, supra note 3, 167 U.S.App.D.C. at 116, 511 F.2d at 354
 
 
 [72]
 These restrictions include the maximum allowable payback period (See note 34 Supra ), economic motivations for producers to proceed expeditiously with development once advances have been "sunk" in qualifying expenditures, and the continued supervision of all aspects of timing and amount of advance payments under the reasonable and appropriate standard
 
 
 [73]
 590 F.2d 664 (7th Cir. 1979)
 
 
 [74]
 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974)
 
 
 [75]
 Id. at 295, 94 S.Ct. 1757
 
 
 [76]
 590 F.2d at 669
 
 
 [77]
 The limitations on permissible retroactivity may be discerned from SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947), and NLRB v. Majestic Weaving Co., 355 F.2d 854 (2d Cir. 1966) (Friendly, J.). The relevant factors include the degree of retroactivity, the need for administrative flexibility, and the hardship on the affected parties. With respect to advance payments the Commission has not changed an explicit past policy (Majestic Weaving) but rather has reaffirmed well-established regulatory principles. The need for flexibility is evident in a case, such as this, where "the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule." Chenery, 332 U.S. at 202, 67 S.Ct. at 1580. The Commission specifically noted the need for a case-by-case determination of the timing question. See note 37 Supra. Hardship to the pipelines is mitigated by two factors. First, the Commission merely has deferred rate-base treatment, not forever disqualified extended front-end advances from inclusion in rate base. Second, even during the deferral period, the pipelines have the assurance that their rates will remain at compensatory levels. FPC v. Texaco, 417 U.S. 380, 391-92, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 585, 62 S.Ct. 736, 86 L.Ed. 1037 (1942)
 
 
 [78]
 590 F.2d at 670
 
 
 [79]
 Id
 
 
 [80]
 See text accompanying note 46 Supra
 
 
 [81]
 See text accompanying note 41 Supra
 
 
 [82]
 Had the Commission considered all pertinent factors, we would not lightly overturn its result merely because of severe hardship for pipeline investors. As recently as FERC v. Pennzoil Producing Co., 439 U.S. 508, 99 S.Ct. 765, 58 L.Ed.2d 773 (1979), the Supreme Court has suggested that the Commission's discretion to withhold relief from harsh application of familiar regulatory principles is not abused unless rate levels border on the confiscatory. Id. 99 S.Ct. at 772. That case involved the Commission's equitable discretion, not the review of a determination, as in this case, of applicable legal standards arising in the context of an experimental, conditionally approved program
 
 
 [83]
 See note 37 Supra
 
 
 [84]
 179 U.S.App.D.C. 274, 551 F.2d 460 (1977)
 
 
 [85]
 No. 77-1712
 
 
 [86]
 Transco Br. in No. 77-1712 at 17-18
 
 
 [87]
 PSC Br. in No. 77-1712 at 4
 
 
 [88]
 No. 77-1496 Et al
 
 
 [89]
 JA in No. 77-1496 Et al. at 313-14
 
 
 [90]
 We construe the pertinent advance payment orders as permitting advances to affiliated producers to be included in Account 166 on the same basis as advances to non-affiliated producers. However, there is no limitation in the orders restricting the Commission's ability to consider the affiliate relationship as one factor pertinent to application of the reasonable and appropriate standard in determining which advances included in Account 166 qualify for rate base-treatment
 
 
 [91]
 FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed.2d 656 (1940); Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)
 
 
 [92]
 No. 77-1496 Et al
 
 
 [93]
 Opinion No. 769, Supra note 44, at 22; JA at No. 77-1496 Et al. at 341
 
 
 [94]
 Id., Commissioner Smith, concurring, at 4; JA in No. 77-1496 Et al. at 357 ("The overall result (on rate of return) is supportable only because of the treatment given advance payments.")
 
 
 [95]
 By purporting to "settle" rate of return yet leaving open the treatment of advance payments, such settlements may have been rooted in an erroneous premise that these issues could be put in separate analytic compartments and resolved independently
 
 
 [96]
 As noted in Niagara Mohawk Corp. v. FPC, 126 U.S.App.D.C. 376, 382, 379 F.2d 153, 159 (1967), "the breadth of agency discretion is, if anything, at zenith when the action . . . relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions."
 
 
 [97]
 In another context, we approved the Commission's determination to ignore the varied impact on producers of the advance payment program, and to make a "clean start" in its prescription of a national rate. The Second National Natural Gas Rate Cases, 186 U.S.App.D.C. 23, 59-64, 567 F.2d 1016, 1052-57 (1977), Cert. denied, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978). But that situation involved allocation among producers of uneven Gains, and prescription of rates for the future. The pipelines are in a different posture. The Commission has latitude to consider whether the pipelines were caught between a rock and a hard place and took actions which they reasonably believe were in the best interests of their customers. This appears to be the thinking of the Public Service Commission of the State of New York. PSC Br. in No. 77-1498 at 14
 There is the further consideration that the ambiguity of the advance payment orders on the timing question may have served the producers as a kind of legal lever to overcome pipeline resistance. In the context of an exception to settled principle, which permitted some "advance" payments, the combination of FERC indefiniteness in the first instance and inaction later on may have given momentum to extended front-end advances. If the FERC takes the view that the ability of the pipelines to resist untoward advances was materially weakened by the agency's handling of the issue, it has latitude to take this into account. In this regard it would be appropriate for the Commission to consider the contrast between Order No. 465, with its absence of any explicit reference to the timing issue, and the notice provided to both pipelines and producers in Order No. 499 that advances must be appropriately expended by the producer within a "reasonable time."
 The impact on the natural gas industry of the advance payment program has been likened to the mark left on a landscape by the wreckage from an airplane disaster. The Second National Natural Gas Rate Cases, supra, 186 U.S.App.D.C. at 64, 567 F.2d at 57. The Commission has latitude in the circumstances to fashion an equitable allocation of burdens between the rate payers and the pipeline investors.
 
 
 [98]
 The vitality of these principles appears from their early statement, E. g., FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940), and their recent reiteration, E. g., FERC v. Pennzoil Producing Co., 439 U.S. 508, 99 S.Ct. 765, 58 L.Ed.2d 773 (1979), discussed in note 81 Supra
 
 
 [99]
 Opinion No. 769, Supra note 44, at 33-34, JA in No. 77-1496, Et al. at 352-53; Opinion No. 769-A, Supra note 32, at 10-13, JA in No. 77-1496, Et al. at 401-04. See JA in No. 77-1496, Et al. at 297 (map)
 
 
 [100]
 Opinion No. 769-A at 12, JA in No. 77-1496, Et al. at 403
 
 
 [101]
 See note 25 Supra
 
 
 [102]
 Opinion No. 769-A at 11, JA in No. 77-1496, Et al. at 402, Quoting Notice of Rulemaking, Supra note 25, 38 Fed.Reg. at 1056
 
 
 [103]
 Id. at 13, JA in No. 77-1496 Et al. at 404; Tennessee Br. in No. 77-1496, Et al. at 66
 
 
 [104]
 See text accompanying notes 51-55 Supra
 
 
 [105]
 See text accompanying notes 56-66 Supra
 
 
 [106]
 See note 34 Supra
 
 
 [107]
 E. g., Opinions No. 672 & 672A, Texas Eastern Transmission Corp., Docket No. RP70-29, Et al., 50 FPC 1419 (1973), 51 FPC 258 (1974), Aff'd, 171 U.S.App.D.C. 25, 517 F.2d 1299 (1975)
 
 
 [108]
 Midwestern Gas Transmission Corp. v. FERC, 191 U.S.App.D.C. 80, 589 F.2d 603 (1978) (ruling, Inter alia, that certain of petitioner's claims were not ripe for review since they depended on the speculative effect on future NEB export policy of FERC action regarding the Alaska Natural Gas Transportation System). See 191 U.S.App.D.C. at 99 n. 107, 589 F.2d at 622 n. 107
 
 
 [109]
 Initial Decision in No. 77-1496 Et al. at 23, JA in No. 77-1496, Et al. at 307. This ruling would have resulted in overall return on rate base of 8.787%. Id
 
 
 [110]
 Opinion No. 769-A at 22, JA in No. 77-1496, Et al. at 341. This ruling resulted in an overall return on rate base on 9.25%. Id. at 23, JA in No. 77-1496 Et al. at 342
 
 
 [111]
 See text accompanying notes 92-95 Supra
 
 
 [112]
 Expenditures of $10.1 million related to a study of the technical and economic viability of converting Middle Eastern crude oil into synthetic natural gas of pipeline quality. Over $9.8 million was devoted to a project for conversion of naptha feedstock into SNG. A study of a program to use natural gas reserves located overseas by converting the gas to crude methanol at its source, transporting the methanol by conventional tankers to the United States, and converting the methanol into natural gas cost.$1.4 million. Over $920.000 was spent on a project to produce methane from coal. Initial Decision in No. 77-1712, Supra note 26, at 5-7, JA in No. 77-1712 at 122-24
 
 
 [113]
 Opinion No. 801-A, Supra note 46, at 2-3, JA in No. 77-1712 at 202-03
 
 
 [114]
 See text accompanying notes 51-55 Supra
 
 
 [115]
 The Commission had previously demonstrated its reliance on this principle in Tennessee Gas Pipeline Co., Opinion No. 624, 48 FPC 149 (1972), Aff'd, 159 U.S.App.D.C. 318, 487 F.2d 1189 (1973) (grant of a certificate to construct liquified natural gas facilities conditioned to prevent rate-base treatment of costs if the project proved unsuccessful). In addition, the Commission's uniform System of Accounts for Natural Gas Companies, 18 CFR 201 (1978), provided clear notice that pipeline investors must absorb costs of abandoned projects involving "preliminary survey plans, investigations, etc. made for the purpose of determining the feasibility of utility projects under contemplation . . . to provide a future supply of natural gas." See PSC Br. in No. 77-1712 at 11
 
 
 [116]
 See 18 CFR 201(103) (1978) (requiring, Inter alia, use of experimental technology and prior Commission approval both absent from Transco's projects); Opinion No. 801-A at 3, JA in No. 77-1712 at 203
 
 
 [117]
 Opinion No. 801-A at 4, JA in No. 77-1712 at 204
 
 
 [118]
 See Opinion No. 801 at 8, JA in No. 77-1712 at 172
 
 
 [1]
 See Citizens to Save Spencer County v. United States Environmental Protection Agency, et al., 195 U.S.App.D.C. 30, 600 F.2d 844 (D.C.Cir. 1979) (Leventhal, J., concurring)
 
 
 [2]
 See, e. g., 196 U.S.App.D.C. ---, 606 F.2d at 1100 (advance payment program was a recognized "departure from the usual rule of public utility regulation . . . that current rates should reflect the cost of supplying service to current rate payers . . ."); Id. at ---, 600 F.2d at 1109-1110 (describing advance payment program as a clear "departure" from, and "modification" of the "used and useful" principle); Id. at --- of 196 U.S.App.D.C., at 1115 of 606 F.2d ("any permission to transfer advances prior to gas delivery . . . entailed some variance from the . . . (regulatory) situation (prior to the commencement of the advance payments program), in terms of benefit to producer and of cost to pipeline and customer.")
 
 
 [3]
 See id. at ---, 606 F.2d at 1099. See also id. at --- of 196 U.S.App.D.C., at 1102 of 606 F.2d ("theory" of the program was that "increased availability of capital would encourage investment, which in turn would yield additional gas supply")
 
 
 [4]
 See id. at ---, 606 F.2d at 1115 ("A producer receiving an extended front-end advance, to use without restriction for a significant period prior to expenditure, is in effect given a sum of money.")
 
 
 [5]
 See id. at ---, 606 F.2d at 1099
 
 
 [6]
 The court's opinion has employed the term "qualifying expenditure" to identify "those producer expenses permissible under the (advance payments) program." See id. at ---, 606 F.2d at 1099
 
 
 [7]
 The court has devised the novel and useful term "extended front-end advance" to describe those advance payments barred from current rate base treatment by Commission orders here under review. See id. at ---, 606 F.2d at 1102
 
 
 [8]
 These years were 1973, governed by FERC Order No. 465, and 1974-75, governed by FERC Order No. 499. See id. at ---, 606 F.2d at 1101
 
 
 [9]
 See id. at ---, 606 F.2d at 1103
 
 
 [10]
 See id. at ---, 606 F.2d at 1105
 
 
 [11]
 See id
 
 
 [12]
 The Commission order barring current rate base treatment to certain "extended front-end advances" made by Tennessee Gas Pipeline Company, for example, was issued on 9 July 1976, See FPC Docket No. RP73-113, Opinion No. 769, more than six months subsequent to the expiration of the advance payment program on 31 December 1975
 
 
 [13]
 See ---, 606 F.2d at 1105 ("Despite the Commission's signal in Order No. 499 that it intended to focus on the critical timing requirement, the flood (of advance payments) did not abate.")
 
 
 [14]
 As noted in the court's opinion, producers may have been "emboldened by . . . (the) indefiniteness (of the advance payment orders on timing)" and therefore the "producers pressed their bargaining advantage, inducing pipelines to make advances long before the funds were used for qualifying expenditures." Id. at ---, 606 F.2d at 1103. See also id. (pipelines' "weakened resistance" to competitive pressures was materially aided by "(t) he belief (or hope) that the Commission would permit rate-base treatment of extended front-end advances")
 Though the court's opinion in other language has not accepted petitioners' argument that the Commission must be "estopped" from denying current rate base to advance payments because the Commission was on notice of the payments and the pipelines relied justifiably on agency silence, See id. at --- - ---, 606 F.2d at 1116-1117, the court's view on this issue is perhaps best summed up in its exceedingly cautious statement that "agency silence . . . (with regard to the scope of a departure from a well-rooted regulatory principle) must be construed to mean that traditional (regulatory) principles retain their vitality." Id. at ---, 606 F.2d at 1110. This modest statement, however, must be placed side by side with the court's repeated observation that the advance payment program constituted an express departure from recognized regulatory principles. See id. at ---, ---, --- , 606 F.2d at 1100, 1109-1110, 1115. Thus it is certainly consistent with the court's position to argue that the "vitality" of the Commission's regulatory principles has been diminished at least to the extent that the Commission itself has backed away from those principles. It would be insupportable for the Commission to bind an industry to regulatory principles from which the Commission has itself departed; thus I believe it is only with some difficulty that we conclude that "agency silence" on the issue of timing of advance payments did not convey a tacit and irreversible assurance that advance payments would be upheld if made in full view of the Commission and in arguable compliance with the Commission's ambiguous regulations.
 
 
 [15]
 We have suggested, for example, that the Commission on remand has "latitude to take . . . into account . . . the view that the ability of the pipelines to resist untoward advances was materially weakened by the agency's handling of the issue," Id. at --- n. 97, 606 F.2d at 1120 n. 97, and "whether the pipelines were caught between a rock and a hard place and took actions which they reasonably believe were in the best interests of their customers," Id. at --- - --- n. 97, 606 F.2d at 1120 n. 97. The Commission also has been urged to take into consideration more generally the "significant factor" of "the impact on the industry of the entire course of Commission action in the development and administration of the advance payment program." Id. at ---, 606 F.2d at 1120
 
 
 [16]
 See, e. g. id. at --- - ---, 606 F.2d at 1099, 1102
 
 
 [17]
 See id. at ---, 606 F.2d at 1102 (an advance payment, as an interest-free loan, "substitutes for capital raised in financial markets"); Id. at ---, 606 F.2d at 1115 ("A producer receiving an extended front-end advance . . . is in effect given a sum of money.")
 
 
 [18]
 See id. at ---, 606 F.2d at 1112
 
 
 [19]
 See id. at ---, 606 F.2d at 1112
 
 
 [20]
 See id. at ----, 606 F.2d at 1102
 
 
 [21]
 See id. at ---, 606 F.2d at 1113
 
 
 [22]
 See id. at ---, 606 F.2d at 1108
 
 
 [23]
 See cases cited in Id. at --- n. 77, 606 F.2d at 1116 n. 77 (hardship on the affected parties a factor to consider in evaluating limitations on retroactivity of agency action)
 
 
 [24]
 See id. at --- - ---, 606 F.2d at 1106; Id. at n. 44 (quoting dissenting view of Commissioner Holloman that, Inter alia, "(a) pipeline . . . faced with . . . (the) competitive climate (in the natural gas market) would be remiss in its attempts to attach new supplies of gas on behalf of itself and its customers if it did not use . . . (the) tool (of offering extended front-end advances) to enter into gas supply contracts")
 
 
 [25]
 Id. at --- - --- n. 30, 606 F.2d at 1103 n. 30. We have also noted that at least one administrative law judge ruling on this case found that a pipeline company's "unchallenged good faith and business judgment . . . qualif(ied) advances as reasonable and appropriate." Id. at --- n. 45, 606 F.2d at 1106-1107 n. 45
 
 
 [26]
 Id. at ---, 606 F.2d at 1119
 
 
 [27]
 As noted in the court's opinion, pipelines have argued that "the sole test for determining whether the advance payments made . . . were to be included in rate base . . . (should have been) whether they were made in order to obtain commitments for additional gas supplies." Id. at ---, 606 F.2d at 1108
 
 
 [28]
 See, e. g., id. at ---, 606 F.2d at 1102